[Civ. No. 15018. Second Dist., Div. Three. Jan. 17, 1947.]

Estate of JENNIE MESNER, Deceased. CHARLES W. CRADICK, Petitioner and Appellant, v. ABRAHAM REICH et al., Contestants and Appellants.

668

Mitchell & Gold, Seymour Gold and Mark F. Jones for Contestants and Appellants.

Dailey S. Stafford and Jean Wunderlich for Petitioner and Appellant.

SHINN, J.—Jennie Mesner executed a will April 19, 1943, and a codicil dated October 6, 1943, under which appellants Esther, Rachel and Freda Reich, with numerous others, were beneficiaries. On November 30, 1943, she executed another will and on December 1, 1943, a codicil thereto, in neither of which were appellants remembered. Mrs. Mesner died December 18, 1943. The latter documents, which will be referred to as the November will, named Abraham Friedman, a half brother of Mrs. Mesner, and Charles W. Cradick, an attorney, as executors. Friedman declined to act and the will was offered for probate by Cradick. The Reichs opposed the petition for probate, alleging unsoundness of mind, and

that the execution of the will was procured by means of the fraud and undue influence of Abraham Friedman. The issues were tried to a jury, which rendered a special verdict that the testatrix was of sound and disposing mind, but that the execution of the will had been induced by fraud and undue influence. Proponent Cradick made a motion for a new trial, upon the grounds, among others, of insufficiency of the evidence and misconduct of a juror. The motion was granted solely upon the ground of irregularity in the trial, consisting of the alleged misconduct. The contestants Reich have appealed from the order granting the new trial and the proponent has filed a cross-appeal from the judgment upon the verdict refusing probate of the will, under rule 3*a* of the Rules on Appeal.

■ We shall consider first the cross appeal of the proponent, Cradick. Upon this appeal, it is urged that the evidence was insufficient to establish fraud or undue influence, and that the judgment should be reversed with directions that the will be admitted to probate. This point is presented as distinct from any questions involved on the appeal from the order granting the new trial. If it should be found to be well taken and that a reversal is in order, the questions involved on the appeal from the order granting the new trial would become moot. But the point is not well taken; there was sufficient evidence to justify a finding that the will was procured by the exercise of undue influence by Abraham Friedman.

Mrs. Mesner at the time of her death was 63 years of age. She had long been a sufferer from a nerve and skin ailment, manifested in an almost unbearable itching sensation which caused her to be extremely nervous, prevented sleep except under the influence of powerful drugs, impaired her nervous system and mental capacities, and gradually wore down her vitality. Early in 1943 she had been in an institution at Rochester for treatment. After her return to Los Angeles she was constantly under the care of physicians and each day was given heavy doses of opiates. She gradually became weaker and on December 18, 1943, she died of exhaustion and failure of heart action. The record is replete with evidence of her intense suffering, her distressed condition of mind, and the hopelessness of her condition. One physician who attended her testified that her condition caused a degeneration of the brain and nervous system.

In October, 1943, testatrix was in a hospital in Culver City. On or about October 17, a few days before she was returned to her home from the hospital, Abraham Friedman came from Cleveland and took up his abode in her home, and remained there until the time of her death. The Reichs were not relatives, but Mrs. Reich had been extremely attentive and helpful to Mrs. Mesner and was frequently spoken of by the latter as her closest and best friend. Mrs. Reich had sent word to Abraham Friedman, requesting him to come to Los Angeles. The evidence of fraud and undue influence related to the conduct of Friedman in his efforts to prevail upon Mrs. Mesner to execute a new will. The friendly relations between Mrs. Mesner and the Reich family were well established by the testimony of a number of witnesses. Mrs. Mesner was deeply attached to Mrs. Reich and there was no evidence of any rift between the two, nor of any cooling of Mrs. Mesner's affection. Friedman was strongly opposed to the provision which was made for the Reich family by the April will. One of the nurses testified he gave her orders not to allow Mrs. Reich to see Mrs. Mesner and that members of the Reich family were not to be left alone with her at any time; that when the Reichs would come and the nurse left the room, he would order her to return immediately. There was testimony of witnesses who were present in the house that Friedman constantly and persistently urged upon Mrs. Mesner that she change her will and leave all her estate to her relatives. He said to her, "You have to leave everything to your relatives. I want the ear rings to my wife and some of your jewels to be distributed to my daughters." Similar demands were frequently made upon her, both day and night. Mrs. Mesner, despite the use of heavy doses of opiates, seldom went to sleep before 4 or 5 o'clock in the morning and would remain under the influence of the drugs for a considerable time after she awakened. Physicians who called upon her in the morning were often unable to treat her because of her stupefied condition and had to return later in the day. At night when the nurses would leave Mrs. Mesner's room, Friedman would enter it and repeat his demands that she change her will. He bothered her in this fashion as late at 2 or 3 o'clock in the morning. At least a dozen times he sought the assistance of an attending physician, Dr. Rost, in arranging for the execution of a new will by Mrs. Mesner. The physician, according to his testimony, observed that Fried-

man's activities were having a harmful effect upon his patient and threatened to destroy her will to live. In order to avoid what he deemed a persecution of Mrs. Mesner and to end the mental torture which it occasioned, he finally called Mr. Cradick, the attorney, in order that a new will might be prepared. Before he had done this, he inquired of Fanny Sonin, one of the nurses, who slept in a room next to that of Mrs. Mesner, as to the cause of his patient's steady decline and, according to the testimony of Fanny Sonin, the following occurred: "A. He says, 'I have got to know it,' I say, 'Well, if you would be here at night and the whole day, you would know the reason why she is going down,' and he says, 'What do you mean, she has got a nurse, she has got a night nurse, why can't they take care of her?', and I said, 'The nurses are taking care of her but Mr. Friedman annoys her day and night and keeps on talking one thing, ''Change the will, change the will,'' and I say 'Naturally, if she was made out of iron, she couldn't stand it to have somebody tell, ''You are going to die, change the will, change the will.'' ' Q. What did Mr. Friedman say to that? A. He didn't say a word, he was seated and didn't say a word.'' During all the time this was going on, Mrs. Mesner continued to insist to Friedman and to others that she was satisfied with her will and did not desire to make any changes in it. She also complained of the treatment of Friedman. She told Mrs. Reich over the telephone that she, Mrs. Reich, had brought an enemy into her house, and that he was waiting for her to die, that she could not stand it any more, and that she could not get him out of the house. At times she wept, saying that she had so much trouble she could not stand it any more and that she felt that she was going to die. She frequently wept when Friedman was talking to her and on many occasions the nurses called in physicians to quiet her with drugs. Many times Mrs. Mesner expressed a desire to friends that Friedman would leave, saying, "He bothers me more than my sickness," but she declared that she knew of no way to get rid of him. Friedman was heard to call the office of the attorney upon several occasions, and the two were in Mrs. Mesner's room with her for about three-quarters of an hour shortly before the execution of the will. The described activities of Friedman were continuous over a period of about one and a half months. Mrs. Mesner was not shown to have been free from the pressure which he was exerting at any

time until after she had made the new will. She passed away less than three weeks after the will was executed.

The conditions under which Mrs. Mesner lived for some five or six weeks immediately prior to the execution of the will were described by numerous witnesses for the contestants. There was abundant testimony to prove that Friedman was making a determined effort to have his way and that Mrs. Mesner consistently opposed him. A more detailed statement of the evidence upon these points would but emphasize the strength of the case of the contestants. Their evidence presented a case of a woman who was tortured in her body by a most distressing and weakening illness and in her mind by the persistent pressure of a half brother to induce her to revoke a will with which she was entirely satisfied, and to make a new one which would omit all provision for her closest friend, and the friend's family, and provide more bountifully for some of her relatives.

The arguments of cross-appellant go to the weight, rather than the sufficiency of the evidence. One of them is that the terms of the new will were of small advantage to Abraham Friedman and that he would have had little incentive to induce Mrs. Mesner to change the earlier will. We observe that he took eight percent of the estate under the April will, and twelve percent under the November will. The share of Mike Friedman, a brother, was increased from three percent to five percent of the estate. Esther, Rachel, and Freda Reich each took two percent by the earlier will and nothing under the later one. Eight others who were remembered in the April will with small percentages of the estate took nothing under the November will. There were three bequests of two percent each, one of three percent, and one of one percent to legatees who were not remembered in the April will. The estate, it is said, was of the approximate value of $150,000. The November will contained thirty bequests, consisting of percentages of the estate, and they totalled ninety-five percent. It did not increase any of the earlier bequests, other than those of Abraham Friedman and his brother Mike. The increases to them equalled the six percent that was taken from the three members of the Reich family. The argument that Abraham Friedman had no incentive to bring about a change in the terms of the April will must fail in view of these facts. But it is quite immaterial, so far as this court is concerned, whether he had such incentive. The case of the contestants

did not depend upon a presumption of the use of undue influence, nor upon evidence that Abraham Friedman profited by the new will. There was direct evidence of his use of undue influence.

Cross-appellant's further arguments are to the effect that the jury was not justified in drawing the inference that the will was executed as the direct result of the insistence and importunities of Friedman. This is saying, in substance, that the only reasonable inference that could have been drawn from the conditions described by the witnesses for the contestants was that Mrs. Mesner voluntarily changed her mind, was better satisfied with the terms of the November will than she had been with those of the April will, and that she reached this conclusion uninfluenced by any effort on the part of Friedman to force his wishes upon her. We are satisfied that the evidence indicated the reverse to be true. There was nothing in the evidence of the contestants to suggest that Mrs. Mesner was dissatisfied with the earlier will. There was much to indicate that the presence of Friedman in her home and his efforts to accomplish his purpose weighed heavily upon her mind and caused her much distress. As her vitality failed, her ability to resist diminished. It was a reasonable conclusion that it was never her desire to omit provision in her will for the contestants; that she resisted doing so as long as she had power to resist, and gave in to the demands of Friedman only as the price of peace. If, as the jury found to be the case, Mrs. Mesner reluctantly abandoned her own wishes with respect to the disposition of her estate, and acquiesced in those of Friedman under the conditions portrayed by the evidence of the contestants, there was made out a complete case of the execution of a will brought about by the use of undue influence. The undue influence which will invalidate a will may be exercised in several ways. One of these is by insistent importunity carried to such an extent that it destroys free agency, overcomes the will of the testator without convincing his judgment, and brings about the execution of a will which expresses the desires of the person exerting the influence, rather than those of the testator. (*Estate of Sproston,* 4 Cal.2d 717 [52 P.2d 924]; *Estate of Greuner,* 31 Cal.App. 2d 161 [87 P.2d 872]; *Estate of Hetterman,* 48 Cal.App.2d 263 [119 P.2d 788].)

The briefs are properly limited to a discussion of the evidence of the contestants, without reference to any evidence of

the proponent that might be in conflict therewith. The judgment in favor of the contestants could be reversed only in case it should be found that the supporting evidence upon the issues of undue influence and fraud was so deficient as to render a new trial unnecessary and to require a direction that the will be admitted to probate. There being no such deficiency of evidence upon the issue of undue influence, the judgment may not be reversed. It is unnecessary to discuss the issue of fraud.

The motion of the proponent for a new trial was made upon numerous grounds. It was not granted for insufficiency of the evidence but the order should be affirmed if it is sustainable upon any of the other grounds of the motion. We are of the opinion that it should be affirmed upon the ground of misconduct of a member of the jury, which constituted a prejudicial irregularity in the trial.

Affidavits and counteraffidavits were filed on the motion for new trial. Those of the proponent set forth facts which, it is contended, were sufficient to show that one of the jurors, Franklin H. Hamilton, was guilty of concealing facts upon his *voir dire* examination which, if disclosed, would have tended strongly to show that he was not in a state of mind which would enable him to act as a fair and impartial juror. He was asked upon *voir dire* whether he knew of any reason why he could not fairly and impartially try the case and he answered that he knew of no such reason and that he would be guided solely by the evidence and the instructions of the court. He and the other jurors were asked whether they had personal or any more than a court room acquaintance with any of the counsel in the case, naming, among others, Charles W. Cradick, the attorney who drew the will and who was named as one of the executors, and offered it for probate. His answer was in the negative. June W. Harrison, one of the jurors, made affidavit as to statements of Hamilton in the jury room during the deliberations, as follows: " 'I don't want this to go outside the jury room, mind you, but I had this man Charles Cradick looked up at the Hall of Records—I have a personal friend there—Cradick was the attorney for the underworld and big gamblers, and was attorney for Albert Marco. You know a man like that can't be believed or trusted. And those girls who work for him can't be believed because they are doing just what he tells them to do.' " Caroline S. Phillips, an investigator, also

made an affidavit, in which she stated that she had interviewed juror Hamilton after the trial and "that during said interview Mr. Hamilton stated to affiant that he had been foreman of said jury and that, while the jury was deliberating and talking the case over, one juror criticized counsel for contestants' denunciation of Charles W. Cradick, proponent of the will, whereupon Mr. Hamilton said he felt he should say something 'to offset' this juror's criticism, and it was then that he stated to the jury that he deemed it his duty to say he had been informed by a responsible friend of his that Mr. Cradick had represented underworld characters and slot machine operators, and that he had had some trouble as an official of Eagles Lodge 102. Questioned as to when he received such information concerning Mr. Cradick, Mr. Hamilton said he thought 'it must have been some months now,' and that he had heard about it several different times." Juror Hamilton, in an answering affidavit, made the following statement: "While the jury was discussing the case one of the jurors criticised attorney Jones for his bitter denunciation of attorney Cradick in the courtroom, affiant thereupon stated that since the subject had come up in regard to one of the attorneys affiant felt it his duty to state what he had heard about attorney Cradick. Affiant stated that he had been informed by a responsible friend of his that Mr. Cradick himself had at times represented underworld characters and slot machine operators, etc., and that he had had some trouble as an official of the Eagles' Lodge No. 102. Affiant stated that he personally did not know anything about Mr. Cradick and that he believed everything that occurred in a jury room should be kept sacred and that the jurors' decisions would be according to the testimony presented and according to the instructions of the court and not according to any statements made by the attorneys. That affiant has no recollection of stating that he had had Mr. Cradick looked up at the Hall of Records and it is not a fact that he had had him looked up. He did not state in words or in substance that an attorney for Albert Marco could not be believed or trusted, but did state that he would not believe attorney Cradick, affiant having based said statement solely upon the testimony of attorney Cradick at the trial of the above entitled case." It was for the court, and not Mr. Hamilton, to decide whether he was qualified to act as a juror. There was a sufficient showing that he entertained a state of mind which rendered it

doubtful whether he would or could be guided solely by the evidence produced at the trial.

It is well settled that intentional concealment by a juror during his *voir dire* examination of a state of mind which would prevent his acting impartially is misconduct constituting an irregularity for which a new trial may be granted under section 657, subdivisions 1 and 2, of the Code of Civil Procedure. (*Williams* v. *Bridges,* 140 Cal.App. 537 [35 P.2d 407]; *People* v. *Galloway,* 202 Cal. 81 [259 P. 332]; *Abercrombie* v. *Thomsen,* 59 Cal.App.2d 331 [138 P.2d 701]; see, also, 20 Cal.Jur. 54; 39 Am.Jur., 65, § 45.)

Affidavits of jurors may be received as to occurrences during the trial and the deliberations of the jury which tend to prove the existence of prejudice in the mind of a juror, which would prevent his acting as an impartial juror, where the state of mind is charged to have been entertained and to have been intentionally concealed during his *voir dire* examination. (*Williams* v. *Bridges, supra; Gray* v. *Robinson,* 33 Cal.App.2d 177, 183 [91 P.2d 194].) This is a recognized exception to the general rule that affidavits of jurors may not be received to impeach the verdict except upon the ground that it was arrived at by resort to chance. (*People* v. *Gidney,* 10 Cal.2d 138, 146 [73 P.2d 1186]; *Maffeo* v. *Holmes,* 47 Cal.App.2d 292 [117 P.2d 948]; 23 Cal.L.Rev. 359.)

Upon the evidence, consisting of the affidavits, the court was warranted in concluding that the sentiments expressed by Mr. Hamilton in the jury room were entertained by him at the time of his *voir dire* examination. His affidavit contained no denial of that fact, and his alleged statements to the investigator, Caroline S. Phillips, carried his information back to a time prior to the commencement of the trial. Appellants say that juror Hamilton was not asked whether he had ever heard anything derogatory concerning any of the parties or their counsel, or knew anything concerning their reputations, and that his answer that he knew of no reason why he could not act fairly and impartially was not shown to have been untrue. We are not in agreement with this contention. The question which the juror answered in the negative is one customarily asked by courts and lawyers in the interrogation of prospective jurors, and it is an invitation to them to disclose such facts as Mr. Hamilton had in his mind. He had been advised during the examination that

Mr. Cradick had prepared the will, was named as one of the executors and was a party to the litigation. He apparently was of the opinion that the information which he claimed to possess was a sufficient reason for believing that Mr. Cradick was not a trustworthy or truthful person. If he had believed otherwise he would scarcely have made the argument in the jury room which was attributed to him, and which he tacitly admitted having made. The argument that he may have believed he could put the information out of his mind, or that he would not be influenced by it must fail in view of his later conduct, and especially in view of the court's implied finding that he was guilty of intentional concealment. The questioning of the jury was sufficient to call for the disclosure of Mr. Hamilton's state of mind toward Mr. Cradick. We cannot agree with the following statement of the contestants in their opening brief, "But in any event, if the respondents desired to obtain a jury whose members had not heard anything derogatory to the parties to the action or to their counsel, then questions directed to this matter should have been asked of the jurors." Counsel for the proponent were not required to go to the absurd length of planting seeds of distrust in the minds of the jurors by propounding such questions.

█ Misconduct or irregularity which does not operate to the prejudice of a party, of course, furnishes no ground for a new trial. The question whether the irregularity was prejudicial is not presented on appeal de novo. The trial judge decided that it was prejudicial from a consideration of all the intangible conditions created by the circumstances and occurrences which went to make up the atmosphere of the court room during the trial, which is something that cannot be adequately reflected in a printed record. It is not unreasonable to believe that the case of the proponent was prejudicially affected by the irregularity and, if it was so affected, he was prevented from having a fair trial. So long as there appears any tangible theory leading to this conclusion, the action of the trial judge is conclusive upon this court. It is not open to review. (*Tunmore* v. *McLeish*, 45 Cal.App. 266 [187 P. 443]; *Abercrombie* v. *Thomsen*, *supra*, 59 Cal.App.2d 331.)

The trial court was not required to speculate as to whether the verdict would have been different, but for the irregularity. Its action in ruling upon the motion was not controlled by

what were considered to be the probabilities that the proponent would prevail upon a retrial. He was entitled to a fair trial before an impartial jury, according to the established forms of law, whether he had a good case or a poor one. The trial judge, although of the opinion that the verdict in favor of contestants was not against the weight of the evidence, was unwilling to allow it to stand, in view of the apparent advantage which they had enjoyed through the presence on the jury of one who was strongly inclined against the proponent of the will. He considered the maintenance of the purity of the trial procedure to be of more consequence than a correct decision of the particular case. We concur in this view. Other grounds urged for affirmance of the order granting a new trial do not require attention.

The judgment is affirmed, subject to the order granting proponent a new trial; the order granting the new trial is affirmed; respondent on each appeal to recover costs of appeal.

Desmond, P. J., and Wood, J., concurred.