[Civ. No. 10861. First Appellate District, Division One.—February 21, 1939.]

In the Matter of the Estate of W. M. GREUNER, Deceased. PHILIP GREUNER, Appellant, v. WELLS FARGO BANK AND UNION TRUST COMPANY (a Corporation), Respondent.

162

Alfred Nelson for Appellant.

Heller, Ehrman, White & McAuliffe and Martin Minney, Jr., for Respondent.

WARD, J.—The sole question presented on this appeal from a judgment of nonsuit is whether or not there was presented sufficient evidence to entitle the contestant Philip Greuner, in a contest to the probate of his father's will, to the submission to the jury of the issue of undue influence.

The evidence shows that for many years the decedent W. M. Greuner had engaged extensively in the operation of real estate holdings. Decedent resided in friendly relations with his wife and five children. In 1931 he permitted his wife, Louise P. Greuner, to read a will that he had made providing bequests for his wife, children, relatives and numerous other parties. This will had evidently been made four or five years prior to 1931 and at a time when Gruener's real estate holdings, etc., were worth from five to ten million dollars. In 1932 the estate was probably worth less than two million. On May 24, 1932, Greuner executed a will under the terms of which all of his estate was bequeathed to his wife, with the provision that should the wife predecease him the estate should be divided equally among his children. Respondent herein, Wells Fargo Bank and Union Trust Company, was named executor. Appended to the will is a written election signed by the wife to take under the will and a waiver of her interest in the community property disposed of by the will. In 1934, possessed of three small pieces of property only,

Greuner died at the age of forty-seven years. The last will was filed for probate and resulted in this contest by the eldest son Philip.

No evidence was introduced supporting the first two grounds of contest, namely, lack of testamentary capacity and that the will had not been properly executed and hence may be disregarded. Supporting the allegation of undue influence exercised by the wife, the following testimony appears: That at the time the will was executed testator's possessions were dwindling and decedent was greatly worried and distressed. The subscribing witnesses to the will were not called. ■ Respondent contends that, in the absence of any evidence from the attesting witnesses, this court may properly conclude that the judgment of nonsuit was properly granted. The failure to call a subscribing witness to the execution of a will is a circumstance to be considered (*Estate of Higley,* 64 Cal. App. 664 [222 Pac. 626]; *Estate of McDonnell,* 109 Cal. App. 577 [293 Pac. 651]), but is not fatal to a contestant's cause if evidence of undue influence is presented. ■ Likewise the age, condition of health, and the period of time elapsing between the date of the execution of the will and the date of death of the testator are important circumstances to be considered, but are not entirely controlling. (*Estate of Doolittle,* 153 Cal. 29 [94 Pac. 240].)

■ Undue influence, if used, must be with the intent of violating a legal or an equitable right; an influence used for an improper purpose, such as the destruction of the desire, intention and determination of the party at the time and in the very act of making the testament. The party using the undue influence need not be present in person at the time of the execution of the document if the influence is present to constrain the party from exercising his free will. The evidence of the use of undue influence need not be direct. It may be circumstantial, but there must be substantial proof of pressure that overpowered the will of the testator. (*Estate of Donovan,* 140 Cal. 390 [73 Pac. 1081]; *Estate of Rickey,* 64 Cal. App. 733 [222 Pac. 628]; *Estate of Hamburger,* 126 Cal. App. 455, 464 [14 Pac. (2d) 802]; *Estate of Short,* 14 Cal. App. (2d) 258 [58 Pac. (2d) 186]; *Estate of Grant,* 8 Cal. App. (2d) 232 [47 Pac. (2d) 508]; *Estate of Finkler,* 3 Cal. (2d) 584 [46 Pac. (2d) 149]; *In re Hess' Will,* 48 Minn. 504 [51 N. W. 614, 31 Am. St. Rep. 665].)

In this case the wife was present at the time of the execution of the will. The rule is well settled in *Estate of Anderson*, 185 Cal. 700, 707 [198 Pac. 407]: "The mere fact that one person has been influenced by the arguments or entreaties of another is not enough to make the influence an undue one. It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person taken in response to the pressure does not in fact represent his conviction or desire brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another. As was said in *Estate of Donovan*, 140 Cal. 390, 394 [73 Pac. 1081], quoting from Chaplin: 'The true test of undue influence is that it overcomes the will without convincing the judgment.'"

Louise P. Greuner, the widow, testified as follows: "Q. Now, Mrs. Greuner, between you and Mr. Greuner throughout your married life, and particularly in later years, there was a very deep and confidential relationship, was there not? A. Yes, there was. Q. And is it not true, also, Mrs. Greuner, that during the spring of 1932 he was very much worried and distressed over his financial difficulties? A. Very much. Q. He was broken down and somewhat impaired physically and mentally, was he not? A. Very much worn and tired by all. Q. So he did not during that time have the same force and energy and determination that he had in his more active years, did he? A. No, he did not. Q. And is it not true that when you talked to him about this question of the will he would very often, if not always, become rather irritated by your discussion of it? A. Yes, that is true. Q. You repeatedly got after him on every trip you were away from home, did you not? A. I did until I finally won out. Q. But on each of those occasions he was very greatly irritated about bringing up the thought of changing that will. Isn't that so? A. Yes. Q. You mean over the Saturday and Sunday of that week end? A. Yes. Q. That was the last time you argued with him over the question of changing that will? A. I think it was. Q. And is it or not true then that he then told you that to change the will and write the will that you wanted was contrary to his judgment, in substance and effect? A. I think he did. The Court: Q. Well, did he say he would change the will finally? A. He did. Q. Then it was not contrary to his judgment,

was it? A. I think it was, but I think he did it to satisfy me at the time. . . . Q. You wanted it that way? A. Yes. Q. And he did not want it that way? A. No. The Court: Q. What did he say about it? A. I don't think he thought it was necessary to change it. Q. What did he say about it? A. He said it wasn't necessary. . . . A. Well, he always said that there wasn't a doubt but that he would get back all that he had lost; that other property he had was just as valuable. He had an indomitable amount of energy in this business, so he took a good deal of wearing down in the changing of his will, but it had to be changed. . . . Q. And he said he would make his will in that manner? A. He never was entirely pleased over the thought, though. Q. Well, he did say he would do that, didn't he? A. To quiet me. . . . Q. Why, may I ask, when this matter came up, did you not call this matter to the attention of Mr. Bingaman rather than to Mr. Clark? A. Why I think the idea was that an absolute stranger would be the person that we would go to at the time. Q. Well, isn't this also true, that you thought possibly Mr. Bingaman would make some resistance on his part? A. Very probably would have been some. . . . Q. But the thought that you had in mind at the time was that you might have some difficulty getting that prepared in the manner you desired by Mr. Bingaman, and a total stranger would not? A. Well, a total stranger wouldn't know any of the former setup at all. Q. You took that into consideration, did you not? A. Why, yes.''

That there was evidence that pressure influenced decedent appears in the testimony of Philip Greuner. ''Q. And what was the conversation in substance and in effect? A. Dad told me that we had come over to San Francisco for the purpose of making a new will, that Mother had been after him for a long time to do so, and that while it was not his judgment to do it, he was doing it that way now and that is why they were here, and they were going up to Mr. Clark's office to accomplish that result. He explained that she wanted everything left to her and that that was not his desire in the matter, but that that was the way she wanted it and in order to accomplish the result of pleasing her, he was doing it that way. Q. Did he say anything else about her at that time, anything mentioned as to any conversation that he and she had had in the past? . . . A. In substance he said

that she had been after him for a long time to do it and that he was perfectly satisfied with things as they were, but that because of her insistence and her constant bringing up and discussion of the matter, he was making the new will to free himself from that pressure, so to speak, of her.''

On the issue of undue influence there was evidence from which a reasonable inference might be drawn that the will was more favorable to the wife than the first will, and direct evidence that the procurement of the will offered for probate was the result of improper, persistent persuasion. In substance and effect the will was contrary to the judgment of the testator. This issue should have been submitted to the jury.

The judgment on the order of nonsuit is reversed.

Tyler, P. J., and Knight, J., concurred.