[Civ. No. 13274. Second Dist., Div. One. Dec. 4, 1941.]

Estate of JOHN HETTERMANN, Deceased. MARIE ZIEGLER, Plaintiff and Appellant, v. OLGA WUNDERLICH HETTERMANN, Individually and as Executrix, etc., Respondent; HANNA CRICE et al., Defendants and Appellants.

E. Neal Ames and Delamere F. McCloskey for Appellants.

Edward T. Sherer and Wendell P. Hubbard for Respondent.

SHAW, J. *pro tem.*—A will of the decedent, John Hettermann, was regularly admitted to probate on petition of the respondent Olga Wunderlich Hettermann. Thereafter a contest of this will was filed by the appellant, Marie Ziegler. The other appellants were made defendants to this contest, but filed an answer in which they admitted the truth of the contesting petition and joined in the prayer for revocation of probate of the will, and, pursuant to stipulation, at the trial they were deemed and treated as contestants, and we refer to them as such. After a verdict in favor of appellants, the respondent, having previously made an unsuccessful motion for a directed verdict in her favor, made a motion for judgment in her favor notwithstanding the verdict. This

motion was granted and all the contestants appeal from the order granting the motion and from the judgment entered upon the order.

Several grounds of contest were alleged by the original contestant, Marie Ziegler, one of which was undue influence of the respondent. At the trial a nonsuit was granted as to all the grounds of contest other than undue influence and the ground last mentioned was submitted to the jury, which rendered a verdict in appellants' favor thereon. No complaint is made by the appellants regarding the nonsuit, so we have for consideration only the propriety of the court's action in granting the motion for judgment nothwithstanding the verdict.

■ The law of this state regarding the power of the court to grant such a motion is well established and was stated by this court in *Collins* v. *Nelson* (1936), 16 Cal. App. (2d) 535, 537, 538 [61 Pac. (2d) 479], with citation of supporting authorities. As there held, the power of the court to order a judgment notwithstanding the verdict is subject to the same rules as the power to grant a nonsuit or to direct a verdict. Such an order can be made only when, disregarding conflicting evidence and giving to the evidence favoring the party for whom the verdict was returned all the value to which it is legally entitled, herein indulging in every legitimate inference in his favor which may be drawn from the evidence, the result is a determination that there is no evidence of sufficient substantiality to support the verdict. In making such an order the trial court may not weigh all the evidence of both sides or judge of the credibility of the witnesses, as it may do on a motion for a new trial, but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. These rules are applicable to probate proceedings tried before a jury. (*Estate of Flood* (1933), 217 Cal. 763, 768, 769 [21 Pac. (2d) 579]; *Estate of Leahy* (1936), 5 Cal. (2d) 301, 303 [54 Pac. (2d) 704; *Estate of Arnold* (1940), 16 Cal. (2d) 573, 576, 581, 582 [107 Pac. (2d) 25].)

Respondent is the widow of the decedent, and the sole beneficiary of the will in contest, which was executed on September 7, 1923. The decedent formerly lived in Louisville, Kentucky. In 1916 he came to Los Angeles to live, and there met the respondent, whom he married June 1, 1918, his age then being 68 and hers 43. They established

themselves in a house on Harvard Street in Los Angeles, where they lived until 1926, and then they moved to a house at Santa Monica, where they lived until his death, August 16, 1938. Apparently he engaged in no business after he took up his residence in California, other than the management of his investments, and the estate which he left (valued at $300,000 when the will was made) appears to have been his separate property. During the 20 years of their marriage he and the respondent made several trips to Europe, visiting Germany, where the decedent was born. The contestant, Marie Ziegler, was also born in Germany and is the daughter of a sister of decedent, who brought her with him from Germany to Louisville on his return from a trip he made long before he left Louisville. The other contestants are the children of William Hettermann, a brother of decedent, who lived in Louisville, Kentucky, where these contestants still reside. It is conceded that all the contestants are heirs of decedent and are legally qualified to contest his will.

The facts above stated are undisputed. The contestants introduced evidence regarding many other matters, some of which it is necessary to set forth in detail. Contestant Marie Ziegler testified that in the summer of 1923 she had a conversation with the decedent in which he said to her, ''Don't worry; I took care of you, provided a will for you''; that just before he left Louisville for California in 1916, he said to her, ''Don't worry, I will take care of you''; and further, on cross-examination, ''Q. Mrs. Ziegler, isn't it a fact that almost every time you came to see Mr. Hettermann you inquired of him if he was taking care of you in his will? A. Yes, he said he was going to.''

John P. Ziegler, a son of Marie Ziegler, came to California from Louisville in 1917, and after he arrived here was a frequent visitor in decedent's household. He testified to several conversations he had with decedent. One of them was held in July or August, 1923 (which would be a short time before the execution of the will), and decedent said to him, ''I am having some trouble about my will. My wife thinks that she should have everything, and the relatives should get nothing; I don't think this is right. She is insisting I sign a will that she has had made up for me at the lawyer's office, and I don't want to do it; but tell your mother not to worry.

Olga signed the paper before we were married, agreeing to be satisfied with half of what I had on my estate; she knows the relatives are to get the other half." During another conversation in August, 1923, decedent said: "My wife wants me to go down to the lawyer's office and sign that will, and I don't want to do it; but to keep peace I guess I will have to do it; but tell your mother not to worry."

These statements by the decedent were not competent as evidence of the facts declared by him, as, that his wife was insisting that he sign a will, that she had signed a paper before she was married, etc. As to such matters they were hearsay and inadmissible. (*Estate of Jones* (1913), 166 Cal. 108, 117 [135 Pac. 288]; *Estate of Anderson* (1921), 185 Cal. 700, 719 [198 Pac. 407].) They were admissible for the purpose of showing the decedent's state of mind and feelings toward those interested in his estate, at the time he executed the will, and the court in allowing their introduction properly limited it to that purpose. (*Estate of Snowball* (1910), 157 Cal. 301, 308 [107 Pac. 598]; *Estate of Sproston* (1935), 4 Cal. (2d) 717, 722 [52 Pac. (2d) 924].)

 John P. Ziegler further testified that he had overheard two conversations between the decedent and the respondent, regarding the making of the will. The first conversation occurred on Labor Day, 1923, or the day after. The parties stipulated that Labor Day that year fell on September 3rd. Ziegler testified to this conversation as follows, omitting questions and other immaterial parts of the record: "Well, I heard Aunt Olga say, 'Daddy, when are you going to sign that will I have had prepared for you?' . . . 'I don't want to sign that will; I don't think it is fair.' . . . She said, 'Well, I am your wife, and I am entitled to all of your estate, and not only part of it.' And he said, 'Well, Olga', or 'Mama', I don't remember which, he called her both, he said, 'There will be plenty for you even if you have half. You will have plenty.' And then I heard Aunt Olga say, 'I don't care; I want it all; you don't owe the relatives anything any more.' He said, 'But I do. I promised the relatives I would take care of them; and there is Boss Bill with his money; he has to have his money, and I promised it to him in my will.' . . . I remember, too, Olga said, 'If you don't sign it, I will cause you so much trouble you will always regret it', or words to that effect. 'I will commit

suicide', or, 'I will get a divorce. I will do plenty that will make you wish you had.' Then I heard Uncle say, 'Oh, Mama, don't talk like that. There is no hurry. There is no hurry.' '' Ziegler further testified that ''a little while'' after this conversation he saw decedent and the latter appeared ''upset and nervous.'' The term ''Boss Bill'' appearing in the foregoing conversation was the decedent's nickname for William Hettermann, father of some of the contestants. The other conversation overheard by Ziegler occurred two or three days later, and ran as follows: ''I heard Olga say, 'John, are you going to sign that will?' And Uncle John said, 'Well, there is no hurry; there is no hurry; there is plenty of time. I don't want to sign that will, yet; that is not fair.' . . . She said, 'Well, if you don't sign that will, I will make you lots of trouble.' He said, 'Oh, Mama, don't talk like that.' And she said, 'Well, you had better sign that will.' He said, 'Oh, don't worry about it. If you are so upset, I will take care of it. I will take care of it. I will do it.' . . . She said she wanted him to sign that will; she had waited long enough, words to that effect. If he didn't sign it she would make lots of trouble; she would commit suicide if necessary . . . Q. And what was the last thing you heard of the conversation, whether from Uncle John or Aunt Olga? A. He said, 'I don't want any trouble; I don't want any trouble, I will do it. I will take care of it.' ''

The respondent argues that these conversations are not definitely connected with the will in contest. It is true, the connection is not directly established; but the record contains nothing to suggest that the decedent had any other will in contemplation at this time, and since the will in contest was executed only a few days after the conversations, the jury could properly infer that it was the will under discussion.

Dr. Thomas J. Crice, husband of one of the contesting parties, who lived in Louisville, Kentucky, testified that he had known decedent since 1910, had met him occasionally up to the decedent's departure from Louisville in 1916, and had heard him declare in 1915 to his brother, William Hettermann (father of the contestants other than Marie Ziegler), that, ''I am going to provide in my will for you and your family.'' This witness further testified that decedent and re-

spondent visited Louisville in the fall of 1923, either late in November or early in December, and came to the witness' home for dinner. Having qualified as a physician and psychiatrist, the witness further testified that on this occasion the decedent "came up the steps rather stooped on his wife's arm, and holding a cane with the other hand. . . . His gait wasn't as snappy and set as it was when I last saw him in 1916. His long flowing brown beard was cropped to a close white; his shocky brown hair was turned white as snow; he was a little uncertain on his feet, and when he got into the room he seemed to breathe a little heavily as though the exertion had some effect on him. . . . In engaging him in general conversation I was impressed with the rather retardation of his mental activity, changing from one of great activity, great force, great foresight to one of an indifference to things in general. . . . His general appearance to my mind as a medical man was that he was undergoing a pre-senile condition, particularly mental pre-senility. Q. What do you mean by that, Doctor? A. I mean a change of personality, a change of the general physical, the general appearance of the man's face, his eyes, his manner of speech, and his subdued mental activity, retarded mental activity. It was quite noticeable, because I had known Mr. John Hettermann years previous to that to be absolutely the reverse physically and mentally." The witness further testified: "The cause of that" (the physical condition) "from observation, knowing the man as I did, in my opinion that was the beginning of general arteriosclerosis, or hardening of the arteries. . . . I am not able to be definite just when the condition begun, how fast it had developed, but as a medical observer it was apparent. . . . General arteriosclerosis, or hardening of the arteries, comes on slowly, insidious." The witness said further, "Q. And what effect does that have on the activity of the brain, if any, and mentality? A. In early manifestations of arteriosclerosis, and, particularly, I am speaking now of the brain, we have slowness of thought. . . . In this particular case I noticed a change in personality as far as his mental condition is concerned, a mental indefiniteness and a slowness of thought." Dr. Crice also testified that a person in such condition would not have the resistance to threats of the kind to which Ziegler testified, that one in good health would have.

This witness also testified that during the dinner which decedent and respondent attended at the witness' house, respondent told decedent not to eat the food served, after the soup, as it might be poison, and decedent ate nothing more. Mrs. Crice, wife of the witness last mentioned, testified to this same occurrence, the time of which she also fixed as November or December 1923, and she also gave similar testimony as to the physical appearance of decedent at the time of the dinner.

Accepting the testimony we have reviewed as true, and drawing from it all legitimate inferences in favor of the verdict, we find it sufficient to support the jury's finding that the contested will was the product of undue influence exerted by the respondent on the decedent. This testimony presented to the jury a man considerably weakened, mentally and physically, from his former condition, and not well able to resist importunities urged upon him; a man well disposed toward the contestants and apparently desirous of making provision for them in his will. It is true Dr. Crice's testimony related to a time nearly or quite three months after the will was executed, but from his testimony it appeared that the described condition of the decedent must have been developing for some time, and the jury may properly have inferred that such condition existed to a considerable extent when the will was executed. Respondent was the wife of decedent and thus in a confidential relation to him. By her own admission, in one of the conversations to which John P. Ziegler testified, she had the will prepared, and she strenuously urged her husband to execute it. ■ It is true, as respondent contends, that a wife may legitimately urge upon her husband her views of the manner in which he should dispose of his property by will, and if she is able to convince him that what she urges is the proper thing for him to do or otherwise inspire in him a real desire to do it, a finding of undue influence cannot be based on her urgency. (*Estate of Donovan* (1903), 140 Cal. 390, 395 [73 Pac. 1081].) But her influence may, nevertheless, become undue if carried to the extent of overriding the husband's volition and destroying his free agency. In *Estate of Snowball* (1910), 157 Cal. 301, 307, *supra,* the court held that, ''While it is true that there must be proof that the influence was used directly to procure the will, general influence not brought to bear upon

the testamentary act not being undue influence (*In re Mc-Devitt,* 95 Cal. 17, 33 [30 Pac. 101]), such proof exists where the evidence is of such a nature as to warrant the inference that the will was the direct result of the influence exerted for the purpose of procuring it, and was not the natural result of the uncontrolled will of the testatrix. (See *Estate of Arnold,* 147 Cal. 583, 589 [82 Pac. 252]; *Estate of Welch,* 6 Cal. App. 44, 50 [91 Pac. 336].)'' This statement was approved in *Estate of Sproston* (1935), 4 Cal. (2d) 717, 722, *supra,* and *Estate of Leahy* (1936), 5 Cal. (2d) 301, 304, *supra.* ▇ ''The true test of undue influence is that it overcomes the will without convincing the judgment.'' (*Estate of Donovan, supra,* at page 394; *Estate of Greuner* (1939), 31 Cal. App. (2d) 161, 164 [87 Pac. (2d) 872].)

▇ Here the jury could find from the evidence above reviewed that exactly this had happened. Within a day or two before the execution of the will the respondent is represented as demanding of decedent that he sign the will, and threatening him with divorce, her suicide and other troubles if he does not sign, and he as saying to her ''I don't want to sign that will, I don't think it is fair,'' but then adding, ''If you are so upset . . . I will do it.'' These are not the words of a man whose judgment is convinced, but of one who yields against his will to overwhelming pressure. The lapse of time, which may have been only a day or two, between this conversation and the execution of the will, does not necessarily dispel the inference. As the court stated in *Estate of Ricks* (1911), 160 Cal. 450, 460 [117 Pac. 532], undue influence must be '' . . . an influence exerted and used *prior to* or at the time of the making of the will and of which the will is the product.'' (Emphasis ours.) The case at bar is very much like *Estate of Greuner, supra,* where it appeared that a husband, in order to please his wife, and at her insistence, but contrary to his own judgment, executed a will which she desired, and it was held that undue influence was sufficiently shown to require the denial of a nonsuit.

Respondent cites a considerable number of decisions where the evidence was held insufficient, as a matter of law, to make out a case of undue influence, but we do not regard any of them as controlling here, because of differences in the facts. Typical of them are, *In re McDevitt* (1892), 95 Cal. 17, 33 [30 Pac. 101], cited in many of the later cases for its declaration that ''Evidence must be produced that pressure was

brought to bear directly upon the testamentary act," and *Estate of Anderson* (1921), 185 Cal. 700 [198 Pac. 407], where many other cases were reviewed and the rule of the McDevitt case was reiterated. In the McDevitt case the court said, speaking of the testator and his brother Andrew, who was charged with undue influence, " . . . there is no proof whatever that he was urged or importuned by Andrew or anyone else to make a will, or that it was ever suggested by anyone that he ought to give his property to Andrew or anyone else." (95 Cal. 24.) In the Anderson case, where undue influence of decedent's aunt was alleged, the court said, "There is no evidence of the aunt importuning the decedent or otherwise exercising any pressure upon her either to make a will or to make one in her aunt's favor." (185 Cal. 704.) Examination of the cases cited in the Anderson case in support of its holding, and of the other cases cited by respondent on this point, discloses that in all of them there was the same absence of any showing that the person charged with undue influence had suggested the making of a will, or the terms thereof, to the testator.

■ It appears from respondent's evidence, to which contestants offered no contradiction, that the respondent was not present at the execution of the will; but that fact alone does not, as a matter of law, overcome the inference of undue influence which may be drawn from the other facts already mentioned. (*Estate of Greuner, supra,* 31 Cal. App. (2d) at page 163; *Estate of Miller* (1936), 16 Cal. App. (2d) 154, 168 [60 Pac. (2d) 498].) If it be thought that such absence of respondent reduces the case to one of circumstantial evidence, it is settled that undue influence may be proved by circumstantial or indirect evidence. (*Estate of Sproston, supra,* 4 Cal. (2d) 722; *Estate of Leahy, supra,* 5 Cal. (2d) 304; *Estate of Presho* (1925), 196 Cal. 639, 654 [238 Pac. 944].)

■ It appears that decedent lived nearly 15 years after he executed the will, but this fact also, while it should be considered by the jury in passing on the question, does not necessarily prove that the will was not the product of undue influence. (See *Estate of Lances* (1932), 216 Cal. 397, 404 [14 Pac. (2d) 768].) The jury may have thought that the influence persisted through these years and prevented any change of the will.

■ Respondent lays some stress on the claimed fact that about two years before the will in contest was executed decedent made a holographic will substantially like it. Such a fact would be deserving of consideration but we need not determine how much weight should be given it, for the jury were not bound to accept the fact as established in this case. The holographic will was not produced, and its existence directly appeared only from the testimony of respondent, which the jury were at liberty to reject if they saw fit. Respondent's sister testified to a declaration made to her by decedent, the purport of which was that he had made such a will; but she had not read the paper he displayed to her, and this declaration was no more competent to prove the fact stated than were the other declarations above discussed. Moreover, this witness' relation to respondent was such that the jury might, in their discretion, reject her testimony also, and we must assume that they did so.

■ The respondent, in her testimony, denied that she had the conversation with decedent to which John P. Ziegler testified, denied the dinner table incident to which the Crices testified, and stated that she and the decedent did not visit Louisville at all in 1923. On the last point she was corroborated by some other witnesses. She also produced many apparently disinterested witnesses who testified that during various parts of a period of time beginning before the will in contest was executed and ending several years after its execution they knew and frequently saw the decedent and that he was a man of great mental and physical vigor, of great determination and strong will, a man who could not be easily swayed or convinced; that he stood erect and walked with a military bearing and a firm step and did not use a cane for support; that he worked in his garden frequently, though not at heavy work; that he had a good memory for names and facts, was a good card player and remembered the cards well; that he took a keen interest in the events of the day, conducted all his own business transactions himself and could not be easily sold on investments but investigated each thoroughly before making a purchase; that he made his decisions independently of advice of others and on one occasion rejected that of respondent on an investment; and that he seemed very fond of, and considerate toward, respondent. Respondent urges that this testimony completely overcomes

the effect of that produced by contestants; and looking merely at the cold record, it does appear that the evidence as a whole preponderates in her favor. She also argues that the testimony of Ziegler is fantastic and incredible, claiming, among other things, that separate accounts given by him of the same event are identical and hence must have been invented and memorized. The story told by him, considered by itself, does not relate anything that could not have happened, and the last mentioned claim finds no support in the facts, for inspection of the separate statements shows that they vary greatly in wording and somewhat in details of the matters narrated. But, as we have already held, none of these matters was proper for the consideration of the court on the motion for judgment notwithstanding the verdict. In addition to the cases already cited, see *Gindraux* v. *Maurice Mercantile Co.* (1935), 4 Cal. (2d) 206, 209 [47 Pac. (2d) 708]; also, *Estate of Burre* (1940), 38 Cal. App. (2d) 518, 521 [101 Pac. (2d) 549], where this court held that, ''Even though it might appear that the trial would have resulted in a judgment for respondent under and by virtue of the evidence adduced, it does not follow that the motion for a nonsuit should have been granted.'' If the trial court deemed the verdict of the jury to be against the preponderance of the evidence, its proper course, as stated in *Hunt* v. *United Bank & Trust Co.* (1930), 210 Cal. 108, 118, was the granting of a new trial, not the making of the order of which complaint is made here.

 An order granting a motion for judgment notwithstanding the verdict is not one of the orders listed as appealable in section 1240, Probate Code. The appeal attempted here from such an order is therefore nugatory and must be dismissed. (*Estate of O'Dea* (1940), 15 Cal. (2d) 637 [104 Pac. (2d) 368].) However, an appeal will lie, under that section, from the judgment or order refusing to revoke the probate of the will; and on such appeal the error in granting the motion may be reviewed.

The appeal from the order granting respondent's motion for judgment notwithstanding the verdict is dismissed. The judgment denying petition for revocation of probate of will is reversed and the superior court is directed to enter judgment in accordance with the verdict, and thereafter to hear

and determine such other and further proceedings as may be necessary to a final disposition of the cause.

York, P. J., and White, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 29, 1942.