131 Cal.App.3d 471 (1982)
182 Cal. Rptr. 550
Estate of DOROTHY MAE BAKER, Deceased.
ALTA CLIFFORD POTTER, as Executrix, etc., et al., Petitioners and Appellants,
v.
CLARENCE BAKER COLEMAN et al., Contestants and Respondents. CLARENCE BAKER COLEMAN et al., Plaintiffs and Respondents,
v.
ALTA CLIFFORD POTTER, Defendant and Appellant.
Docket No. 63577.
Court of Appeals of California, Second District, Division One.
May 6, 1982.
*474 COUNSEL
Raymond C. Simpson, Robert W. Armstrong and Thomas K. Russell for Petitioners and Appellants and Defendant and Appellant.
Young & Young, Walter H. Young and George Walter Young for Contestants and Respondents and Plaintiffs and Respondents.
*475 OPINION
LILLIE, Acting P.J.
This is an appeal from a judgment entered on a special verdict in a will contest and an action to set aside a deed which were consolidated for trial.
Dorothy Mae Baker died February 15, 1978, at the age of 81, leaving an estate valued at $73,131. Her will (executed Jan. 6, 1977) included bequests of $4,500 to her brother Clarence Baker Coleman, $4,500 to Coleman's wife, $100 to each of his two daughters, $1,000 to Dorothy's "godson" David N. Lee and $5,000 to Richard Whitaker, grandson of Dorothy's friend Alta Clifford Potter; Alta was given a tea and coffee service, Dorothy's residence and the residue of the estate;[1] the will named Alta as executrix and Elmer Bromley as attorney for the estate and the executrix. Alta petitioned for probate of the will. Clarence Coleman, as Dorothy's sole blood heir, filed a contest and opposition to probate of those provisions of the will relating to Alta (both bequests and devise to her and her nomination as executrix), Richard Whitaker and Elmer Bromley.[2] The contest alleged: When Dorothy executed the will she was not of sound and disposing mind and was acting under undue influence and fraud on the part of Alta, who stood in a confidential relationship with Dorothy; Alta told Dorothy that she (Alta) was in direct communication with deceased relatives of Dorothy and that she had received messages from them directing Dorothy to make and execute the will in question. David Lee contested the will on the same grounds, alleging that his grandmother was the blood sister of Mary Baker, who had adopted Dorothy.[3]
After filing his contest to the will, Clarence Coleman commenced a separate action (No. C 250700) against Alta to set aside a grant deed executed by Dorothy conveying to Alta a joint tenancy interest in a condominium, and to recover money and securities given to Alta by Dorothy. The complaint alleged that such inter vivos conveyance and *476 gifts were made as the result of Alta's undue influence and fraud practiced in the manner set forth in the will contest. By leave of court, David Lee intervened as a plaintiff. On Coleman's motion, and over objection by Alta and Whitaker, the action was ordered consolidated with the will contest for trial only.
A jury trial resulted in a special verdict which determined: Dorothy was of sound and disposing mind in including in her will the provisions challenged by the contestants; each of such provisions was obtained through undue influence exerted, and fraud perpetrated, by Alta upon Dorothy; during Dorothy's lifetime Alta obtained from her, through the exercise of undue influence and fraud, checks totaling $55,027.37 and shares of stock in Holofile, Inc. and Beehive, Inc.; Alta obtained her joint tenancy interest in the condominium by undue influence and fraud practiced upon Dorothy.
Judgment on the special verdict was entered denying probate to those provisions of the will making bequests and devises to Alta and Whitaker, naming Alta as executrix, and naming Elmer Bromley as attorney for the estate and the executrix. As to case No. C 250700, plaintiffs Coleman and Lee were awarded judgment against Alta in the sum of $66,456.49 ($55,027.37 as principal and $11,429.12 as interest thereon); the judgment directed that any sums recovered be held by plaintiffs as trustees for the benefit of the estate. It was further ordered that Alta deliver to the special administrator of the estate certificates for 1,000 shares each of the stock of Holofile, Inc. and Beehive, Inc. (1) (See fn. 4.) The judgment also set aside the joint tenancy deed to the condominium, and ordered Alta to convey said property by grant deed to the special administrator of the estate and to deliver possession of the premises to him on written demand.[4]
Alta and Whitaker appeal from the judgment contending that the evidence does not support the special verdict of undue influence and fraud in the procurement of parts of the will. (2a) The rules of evidence, the weight to be accorded to the evidence and the province of a reviewing court are the same in a will contest as in any other civil case. (Estate of Bristol (1943) 23 Cal.2d 221, 223 [143 P.2d 689].) "In resolving the issue of the sufficiency of the evidence, we are bound by the *477 established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment.... `In brief, the appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing.' [Citations.] All conflicts, therefore, must be resolved in favor of the respondent." (Nestle v. City of Santa Monica (1972) 6 Cal.3d 920, 925-926 [101 Cal. Rptr. 568, 496 P.2d 480]; italics in original. See also Munoz v. Olin (1979) 24 Cal.3d 629, 635-636 [156 Cal. Rptr. 727, 596 P.2d 1143]; Estate of Teel (1944) 25 Cal.2d 520, 526-527 [154 P.2d 384].) With these principles in mind, we summarize the evidence.
Dorothy never married. She had been adopted by Mary Baker and lived with Mary and Mary's son Arthur ("Bake"), a paraplegic, at 1412 North Alta Vista in Los Angeles. Mary died in 1964, and Arthur in 1971. Dorothy had a blood brother, Clarence, who was reared by foster parents named Coleman. Clarence and his wife stayed at the Baker house for four months in 1965. Dorothy often spoke of Clarence, stating that she was proud of him and loved him. David Lee's grandmother was the sister of Mary Baker, Dorothy's adoptive mother. Lee therefore was Dorothy's cousin by adoption, and she called him her favorite cousin. When Lee's family lived in California (1951-1965) they visited constantly with the Baker family. After the Lees moved to Texas, the Bakers visited them there; following the death of "Bake," Dorothy continued the visits. Until 1976 David Lee saw Dorothy every year; theirs was a warm, close association.
In 1969 Dorothy executed a will leaving $100 to her brother Clarence and the residue of her estate to Mary Baker and "Bake." After their deaths Dorothy said that she intended to divide her estate among Clarence, David Lee and Wallace Baker, another cousin. She told David Lee many times that family heirlooms which had come into her possession would be returned to him upon her death; she promised her cousin Amy Bice that she would leave Amy an antique silver-plated tea service which always had been in the Baker family.
Alta first met Dorothy in 1938 and thereafter continued to see her on a casual basis. Alta also was acquainted with Dorothy's adoptive mother and brother, Mary Baker and "Bake," and knew of their deaths. In 1960 Alta was licensed as a security broker, and occasionally advised *478 Dorothy on investments. Dorothy met Alta's grandson, Richard Whitaker, when he was three or four years old but did not see him again until he was thirty-two. In 1976 and 1977 Dorothy, at Whitaker's invitation, spent Christmas Eve with him and his family at their home.
Lawrence Gelbmann worked three or four days a week in the Baker home from 1952 until Dorothy's death in 1978; thus, he was in close contact with Dorothy over a period of twenty-six years. Gelbmann testified: He first heard of Alta in 1971 when she came to the Baker house to pick up an envelope Dorothy had left for her; before that, he had neither seen Alta nor heard her name mentioned. After his initial meeting with Alta, Gelbmann next saw her in October 1975 when she came to the Baker house and said she had three "visitations" from "Bake" and messages from him for Dorothy. Thereafter, and continuing through January 1978, Alta relayed to Dorothy messages which she (Alta) said she had received from the spirits of Mary Baker and "Bake." These messages included the following: Dorothy should go out more, enjoy life and spend money; she should dispose of her 34 cats so that she would be free to travel; she should get rid of "false friends"; she should sell her house and use the money for travel and to have fun; she should rent an apartment and leave behind the work of managing a house; she should borrow money in order to "live better"; she should sell her unproductive securities and thereafter let Alta manage her securities; she should not go to the home of David Lee for Christmas in 1977, but should spend Christmas with Alta and the Whitakers; she should give $1,000 to Alta's nephew, Steven, for his education. The messages sometimes were accompanied by pleas from "Bake" and mother that unless Dorothy did as they suggested, they would be earthbound and could not go on to a higher plane. The spirits (speaking through Alta) also warned Dorothy occasionally that if she did not do as they advised, they would leave her and she would be on her own. With the exception of selling her house and renting an apartment, Dorothy did exactly as Alta had told her the spirits of mother and "Bake" advised.
David Lee and several of Dorothy's friends testified that Dorothy told them she had met a real psychic (Alta) who gave her messages from "Bake" and mother. Dorothy truly believed in the messages and believed that they came from "Bake" and mother.
The final message from the spirits through Alta was that Dorothy should take a trip to Peru. Dorothy was 81 years old and weighed 78 *479 pounds; she had suffered heart attacks in 1975 and 1976, and also suffered from emphysema; her doctor warned her against high altitudes. Therefore, she was reluctant to go and worried about going to Peru but felt that she must because Alta had told her mother and "Bake" wanted her to take the trip and "Bake" said she would be all right. She had to go and was afraid not to go because if she did not "Bake" and mother would be earthbound and could not move to a higher plane, and Alta told her she might be unable to communicate with the spirits again. Alta knew that Dorothy had been hospitalized in 1976 with a heart attack and that she could have another heart attack on the trip. In January 1978, Dorothy and Alta went to South America, including Peru. There, Dorothy visited Cuzco and Machu Picchu; several days later in Ecuador, she was hospitalized for a coronary for one day. Dorothy returned to Los Angeles in a wheelchair and again was hospitalized; on February 15, 1978, she died as a result of cardiorespiratory arrest.
In the fall of 1976, Dorothy asked Alta to recommend an attorney to draw a will. Alta supplied the name of Elmer Bromley, whom she had known for over 30 years. At Dorothy's request, Alta made an appointment for Dorothy with Bromley and drove her to his office to keep the appointment. After they arrived Dorothy said that she was going to discuss the terms of her will. Alta said, "Well, this doesn't concern me so I am going to leave," then left Bromley's office. Dorothy told Bromley that she did not want the will to be contested and was thinking of leaving her brother Clarence a small sum of money. Bromley suggested that if she left him "a little more," perhaps he would not contest the will. Dorothy then decided to leave Clarence and his wife $4,500 each. On January 6, 1977, Dorothy executed her will in Bromley's office. Present on that occasion were Bromley, his secretary and Robert Ross, an attorney; the secretary and Ross acted as witnesses.
Between December 17, 1976, and December 22, 1977, Bateman, Eichler, Hill Richards issued to Dorothy checks totaling $181,678.60, representing proceeds from sales of her securities. Dorothy deposited these checks in her checking account and wrote on that account checks payable to Alta totaling $50,348.95 which Alta deposited in her account. Dorothy also wrote checks payable to Alta totaling $9,809.50 which Alta did not deposit, but cashed instead.
Alta testified: In December 1976 she and Dorothy arranged for the purchase of a condominium and the purchase of shares of Holofile and *480 Beehive stock; under this arrangement Alta was to acquire a half interest in the condominium by paying for the shares of stock which were to be issued in the names of Alta and Dorothy; however, Dorothy actually supplied Alta with all of the funds for the purchase of both the Holofile and the Beehive shares (total purchase price of $12,437); the purchase price of the condominium was $64,000; Dorothy made the down payment of $26,577 and signed a promissory note for the balance; she made payments of $413 per month on the note until her death; Alta moved into the condominium and paid Dorothy no rent for it; Dorothy originally took title to the condominium in her name alone by grant deed recorded March 31, 1977; she subsequently executed a deed, recorded May 24, 1977, conveying to Alta a joint tenancy interest in the condominium; Alta gave Dorothy no valuable consideration in exchange for such interest; Dorothy had trust and confidence in Alta in December 1976 and January 1977. Gelbmann testified: Dorothy told him that she trusted Alta because Alta was a "woman of the world," knew real estate, was an investment counselor and broker, and knew about "buying and selling and the money market."
(3a) Undue influence consists of conduct which subjugates the will of the testator to the will of another and causes the testator to make a disposition of his property contrary to and different from that which he would have done had he been permitted to follow his own inclination or judgment. (Estate of Franco (1975) 50 Cal. App.3d 374, 382 [123 Cal. Rptr. 458].) A presumption of undue influence arises when there is a concurrence of the following elements: (1) the existence of a confidential or fiduciary relationship between the testator and the person alleged to have exerted undue influence; (2) active participation by such person in the preparation or execution of the will; and (3) an undue benefit to such person or another person under the will thus procured. (Estate of Gelonese (1974) 36 Cal. App.3d 854, 861-862 [111 Cal. Rptr. 833]; Estate of Peters (1970) 9 Cal. App.3d 916, 922 [88 Cal. Rptr. 576]; Estate of Morgan (1957) 148 Cal. App.2d 811, 814 [307 P.2d 686].) The evidence establishes the existence of the first element, for Alta herself testified that Dorothy had trust and confidence in her. "Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." (Estate of Cover (1922) 188 Cal. 133, 143 [204 P. 583].) Nor can it be denied that Alta (and her grandson Whitaker) unduly profited under Dorothy's will. The question whether the proponent unduly profited by the will is resolved by the terms of the *481 will itself. (Estate of Bucher (1941) 48 Cal. App.2d 465, 473 [120 P.2d 44].) Under the will in question Alta was given the bulk of the estate and Whitaker was given $5,000, a sum greater than any of the bequests to members of Dorothy's family. As stated in Estate of Trefren (1948) 86 Cal. App.2d 139 [194 P.2d 574]: "If there had been no will respondent would have received all of said property [Prob. Code, § 225] and appellant none. Under such circumstances we do not believe that it can be held that there is no evidence in the record from which a jury would be justified in concluding that appellant ... unduly profited by the will." (P. 149.)
(4) Activity on the part of the proponent in procuring execution of the will may be established by inference, that is, by circumstantial evidence. (Estate of Garibaldi (1961) 57 Cal.2d 108, 113 [17 Cal. Rptr. 623, 367 P.2d 39]; Estate of Jamison (1953) 41 Cal.2d 1, 8 [256 P.2d 984].) "While it is true that there must be proof that the influence was used directly to procure the will, general influence not brought to bear upon the testamentary act not being undue influence [citation], such proof exists where the evidence is of such a nature as to warrant the inference that the will was the direct result of the influence exerted for the purpose of procuring it, and was not the natural result of the uncontrolled will of the testatrix." (Estate of Snowball (1910) 157 Cal. 301, 307 [107 P. 598]; see also Estate of Leahy (1936) 5 Cal.2d 301, 304-305 [54 P.2d 704]; Estate of Sproston (1935) 4 Cal.2d 717, 722 [52 P.2d 924].) In determining whether undue influence was exerted by the proponent upon the testator in the execution of his will, the jury is not limited to the actual time the will was executed, but may consider facts bearing upon undue influence both before and after execution so long as they tend to show such influence when the will was executed. (See Estate of Larendon (1963) 216 Cal. App.2d 14, 19 [30 Cal. Rptr. 697].) Nor need the one using the undue influence be present in person at the time of the execution of the document if the influence is present to constrain the party from exercising his free will. The evidence of the use of undue influence need not be direct but may be circumstantial. (Estate of Greuner (1939) 31 Cal. App.2d 161, 162 [87 P.2d 872].) "`That the alleged wrongdoer had power or ability to control the testamentary act may be established by a variety of circumstances,  such as control over the decedent's business affairs, dependency of the decedent upon the beneficiary for care and attention, or domination on the part of the beneficiary and subserviency on the part of the deceased. Unless explained, a transfer of property by the decedent to the alleged wrongdoer *482 has a tendency to establish the charge of undue influence....'" (Estate of Washington (1953) 116 Cal. App.2d 139, 145-146 [253 P.2d 60].)
The evidence establishes: After the death of mother and "Bake," Alta, who had been only a casual acquaintance, represented herself to Dorothy as a medium or psychic able to communicate with the spirits of the dead; beginning in 1975 and continuing to the time of Dorothy's death in 1978, Alta relayed to Dorothy "messages" from her mother and brother "Bake" instructing her to do or not to do certain things; Dorothy believed Alta to be a true psychic and medium, and believed in the messages and, with but two exceptions, did as they instructed; Alta thus obtained total control of Dorothy's mind; her mind was under Alta's domination, and Dorothy's conduct was guided by the messages to the extent that Alta was able to and did direct her in financial matters, succeeded in alienating Dorothy from her relatives and friends, prevailed upon her to kill her pet cats and persuaded her to terminate her relationship with her stockbroker and turn over to her her stocks; during the year in which Dorothy executed her will, she was induced by Alta through her "messages" from dead relatives to and did give to Alta over $60,500 in checks, free trips and other benefits, and paid for stocks and a condominium in which Alta was given a joint tenancy interest, all without any consideration having been furnished by Alta in return. Then within a year of the execution of her will, and knowing Dorothy had had several heart attacks and could have another in high altitudes, Alta prevailed upon Dorothy to take a trip to Peru by representing to her that mother and "Bake" wanted her to go and would remain earthbound and be unable to rise to a higher plane if she did not; Dorothy was thus persuaded by Alta to make the trip even though she knew she could suffer another heart attack and it would hasten her death. (3b) From this evidence the jury reasonably could infer that Alta procured the will through the same means (acting as a medium with messages from the dead) whereby she obtained from Dorothy gifts of money and interests in the stocks and condominium. Such inference is particularly compelling in light of the evidence that Alta had the same control over Dorothy's mind after execution of the will that she had prior thereto even to the point of persuading her by messages from her dead relatives to take a trip she knew could endanger her life. The record demonstrates that Alta's control over Dorothy's mind and her influence so pervaded Dorothy's thought processes that they completely subverted her will to the wishes and domination of Alta, and that this imposition continued from the moment Dorothy was convinced Alta was a true psychic and medium to immediately before her death.
*483 (5) Alta's procurement of the will, coupled with the remaining two facts (confidential relations and undue profiting), gave rise to a presumption of undue influence; the burden then was cast upon appellants to show that the will was not the result of undue influence. (Estate of Clegg (1978) 87 Cal. App.3d 594, 602 [151 Cal. Rptr. 158]; Estate of Gelonese, supra, 36 Cal. App.3d 854, 861; Estate of Hall (1958) 158 Cal. App.2d 466, 474 [322 P.2d 1011].) Alta produced evidence that she was not present at the execution of the will; but that fact alone does not, as a matter of law, overcome the inference of undue influence in procuring the will which may be drawn from other evidence. (Estate of Hettermann (1941) 48 Cal. App.2d 263, 273 [119 P.2d 788].) It is for the trier of fact to determine whether the presumption of undue influence has been rebutted. (Estate of Peters, supra, 9 Cal. App.3d 916, 922.) The question of whether or not this burden was met was for the jury. (Estate of Clegg, supra, 87 Cal. App.3d 594, 602.) On this record we must sustain the jury's implied finding that appellants did not meet the burden of overcoming the presumption of undue influence which arises under the circumstances in this case.[5]
Appellant Whitaker contends that the special verdict must be set aside because it is supported chiefly by the "incredible testimony" of Lawrence Gelbmann. (2b) The trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case. (Estate of Teel, supra, 25 Cal.2d 520, 526; and see Evid. Code, § 312, subd. (b).) The determination of the trier of fact will be interfered with on appeal only when it appears that the witness' testimony is inherently so improbable as to be unworthy of belief. (Wilson v. State Personnel Bd. (1976) 58 Cal. App.3d 865, 877 [130 Cal. Rptr. 292].) It cannot be said that Gelbmann's testimony falls within that category. Other witnesses testified that Dorothy told them she had met a real psychic (Alta) who gave her messages from the deceased Mary Baker and "Bake" and that she believed in the messages and believed they came from her mother and "Bake."
Whitaker attacks the special verdict on the further ground that it is contrary to the "well-accepted judicial policy which favors testacy over intestacy." (6) The rule is that a will must be construed according to *484 the intention of the testator, and so as to avoid intestacy. (Prob. Code, §§ 101, 102; Estate of Barnes (1965) 63 Cal.2d 580, 583 [47 Cal. Rptr. 480, 407 P.2d 656].) This obviously is a rule of construction and, as such, has no bearing on the issues submitted to the jury herein, i.e., whether certain parts of the will were procured by undue influence and fraud. Whitaker further argues that inasmuch as the judgment denies probate to the provisions of the will relating to Alta and Whitaker, and the contestants (Dorothy's surviving heirs at law) are entitled to only $1 each under the will's disinheritance clause,[6] the bulk of the estate will escheat to the State of California contrary to Dorothy's intention. The argument fails. (7) Before a disinheritance clause in a will becomes effective, the testator must make a valid disposition of his property. (Estate of Heney (1944) 66 Cal. App.2d 867, 869 [153 P.2d 427].) "It is settled that a disinheritance clause, no matter how broadly or strongly phrased, operates only to prevent a claimant from taking under the will itself.... Such a clause does not and cannot operate to prevent the heirs at law from taking under the statutory rules of inheritance when the decedent has died intestate as to any or all of his property." (Estate of Barnes, supra, 63 Cal.2d 580, 583.) Because the judgment denies probate to the provisions of her will leaving property to Alta and Whitaker, Dorothy died intestate as to that property; it therefore passes to contestants as her heirs at law, notwithstanding the disinheritance clause.
(8) Whitaker's final contention is that the order of consolidation was improper because probate matters and civil lawsuits may not be consolidated for trial. The contention lacks merit. Code of Civil Procedure section 1048 provides in pertinent part: "(a) When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated and it may make such orders concerning proceedings therein as may tend to avoid unnecessary *485 costs or delay." There is nothing in the statute which prohibits the consolidation ordered herein. Whether separate actions shall be consolidated for trial is a matter within the discretion of the trial court and its decision will not be disturbed on appeal absent a clear showing of abuse of discretion. (Fellner v. Steinbaum (1955) 132 Cal. App.2d 509, 511 [282 P.2d 584].) That consolidation in the present case was not an abuse of discretion is shown by Estate of Bliss (1962) 199 Cal. App.2d 630 [18 Cal. Rptr. 821], wherein it was held that a will contest and an action to set aside an inter vivos gift made by the testator to the proponent of the will were properly consolidated for purposes of trial. (Pp. 640-641.) Whitaker argues that in any event consolidation denied him a fair trial. We do not agree. "A consolidation of actions does not affect the rights of the parties. The purpose of consolidation is merely to promote trial convenience and economy by avoiding duplication of procedure, particularly in the proof of issues common to both actions." (Wouldridge v. Burns (1968) 265 Cal. App.2d 82, 86 [71 Cal. Rptr. 394].) Whitaker does not deny that the evidence produced herein was relevant to issues in both the will contest and the action to set aside the deed and other inter vivos gifts to Alta. The only "unfairness" to Whitaker resulted from the nature of that evidence, not from the fact of consolidation.
Alta contends that the special verdict was the result of confusion on the part of the jury, as shown by the following circumstances. In the course of its deliberations the jury sent the court a note asking: "If questions [issues] 7 to 12 are answered completely opposite from questions 1 to 6, do they negate each other?"[7] After discussing with counsel at some length possible answers to the question, the court told the jury: "You are not to be concerned with your question as to whether your answers to issues 1 through 6 are completely opposite to your answers to issues 7 through 12." The court then asked the foreman of the jury: "Mr. Montez, do you believe that the Court has responded to the question?"; the foreman replied "Yes." It is thus apparent that the court's answer dispelled any confusion on the subject which may have existed in the minds of the jurors. Following the court's answer the jury resumed its deliberations, ultimately determining that while Dorothy was of sound mind in making the bequests and other provisions of her will challenged by contestants, each of such provisions was obtained through *486 undue influence exerted by Alta. (9) That determination was proper. "Soundness of mind and body does not imply immunity from undue influence. It may require greater ingenuity to unduly influence a person of sound mind and body, and more evidence may be required to show that such a person was overcome than in the case of one weak of body and mind. But history and experience teach that minds of strong men and women have often been overborne, and they have been by a master mind persuaded to consent to what in their sober and normal moments, and free from undue influence, they would not have done." (Estate of Olson (1912) 19 Cal. App. 379, 386 [126 P. 171].)
(10) Alta further contends that she was denied a fair trial because, in the course of her testimony, the judge threatened her with contempt and incarceration if she continued to give unresponsive answers to questions put to her by counsel. Specifically, she argues that the judge's conduct intimidated her to such an extent that she "could not coherently tell her story." The contention lacks merit. Called as a witness by contestants-plaintiffs (Evid. Code, § 776), Alta repeatedly gave unresponsive answers to counsel's questions. Finally, out of the presence of the jury, the judge warned Alta that if she continued to volunteer testimony not called for by a question, she would be held in contempt of court and incarcerated.[8] The record does not indicate that the judge's admonitions deterred Alta from attempting to "tell her story." On the contrary, despite the threat of contempt and incarceration she persisted in volunteering information not called for by the questions.
*487 The judgment is affirmed.
Hanson (Thaxton), J., and Dalsimer, J., concurred.
A petition for a rehearing was denied June 3, 1982, and appellants' petition for a hearing by the Supreme Court was denied June 30, 1982.
NOTES
[1] The will also included bequests totaling $12,000 to religious and charitable institutions and a bequest of $1,000 to Dorothy's goddaughter.
[2] "A will or part of a will procured to be made by duress, menace, fraud or undue influence, may be denied probate...." (Prob. Code, § 22; italics added. See also Estate of Molera (1972) 23 Cal. App.3d 993, 1001 [100 Cal. Rptr. 696].)
[3] The contest filed by Lee further alleged that any conflict between Clarence Coleman and Lee as to which was entitled to inherit from Dorothy had been resolved by their agreement to divide whatever share either or both of them might succeed to.
[4] Where, as here, two lawsuits are ordered consolidated for trial and are actually tried together, a single judgment is proper. (See Bank of California v. Connolly (1973) 36 Cal. App.3d 350, 363 [111 Cal. Rptr. 468].)
[5] Undue influence and fraud are separate and distinct grounds for setting aside a will. (Prob. Code, § 22; Estate of Newhall (1923) 190 Cal. 709, 718 [214 P. 231, 28 A.L.R. 778].) However, the evidence herein likewise supports the special finding of fraud in the procurement of the challenged portions of the will.
[6] That clause (paragraph eleventh of the will) reads: "If any devisee or legatee under this will, or any person claiming under or through any devisee or legatee or any other person who, if I died wholly or partly intestate, would be entitled to share in my estate, shall in any manner whatsoever, directly or indirectly, contest this will, or attack, oppose or in any manner seek to impair or invalidate any provision hereof, or shall in any manner whatsoever conspire to cooperate with any person or persons attempting to do any of the acts or things aforesaid, or shall settle or compromise, directly or indirectly, either in or out of court, with any such contestant, or shall acquiesce in or seek to oppose such proceedings, or shall endeavor to succeed to any part of my estate, otherwise than through this will, then and in each of the above mentioned cases I hereby give, devise and bequeath to such person or persons the sum of One Dollar ($1.00) each only."
[7] Issues 1 through 6 asked whether Dorothy was of sound and disposing mind in including in her will each of the provisions challenged by contestants; issues 7 through 12 asked whether each of such provisions was obtained through undue influence exerted by Alta upon Dorothy.
[8] The following colloquy occurred: "THE COURT: I order you, Mrs. Potter, to listen carefully to each question that is put to you. Did you hear that?

"THE WITNESS [Alta]: Yes.
"THE COURT: And I do not want you to volunteer any testimony that the question does not call for, do you understand that?
"THE WITNESS: Yes.
"THE COURT: Because if you were to continue to volunteer testimony that is not called for by a question, I will hold you in contempt of court, do you understand that?
"THE WITNESS: Yes.
"THE COURT: And if I find you in contempt of court, I will remand you to the custody of the Sheriff of Los Angeles County to be taken to Sybil Brand Institute, for booking, photographing, and for incarceration for such period as I fix, do you understand that?
"THE WITNESS: Yes.
"THE COURT: Do you have any questions of me before I have the jury return to the courtroom?
"THE WITNESS: (no audible response)
"THE COURT: Did you hear my question?
"THE WITNESS: I understand.
"THE COURT: Do you have any questions of me before I have the jurors return to the courtroom?
"THE WITNESS: It is very difficult for me to answer these questions, yes or no.
"THE COURT: If a question is put to you that you cannot answer with either a yes or no, will you please so state?
"THE WITNESS: Yes. I would be happy to do that."
A second, similar admonition was given to Alta again out of the presence of the jury.