Filed 6/29/16  Key v. Tyler CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SARAH PLOTT KEY, | B258055 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BP131447) |
| v. | **ORDER MODIFYING OPINION** |
| ELIZABETH PLOTT TYLER, | **[No Change in Judgment]** |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on June 27, 2016, be modified as follows:

Page 1 (caption):  Change the designation of Elizabeth Plott Tyler from Defendant and Respondent to Defendant and Appellant.

This modification does not effect a change in judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SARAH PLOTT KEY, | B258055 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BP131447) |
| v. | |
| ELIZABETH PLOTT TYLER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Reva Goetz, Judge.  Affirmed.

Magee & Adler, Eric R. Adler; Murphy Rosen, Paul Murphy; Greines, Martin, Stein & Richland, Robin Meadow, Cynthia E. Tobisman, Jeffrey E. Raskin for Defendant and Appellant.

Oldman, Cooley, Sallus, Birnberg & Coleman, Mary-Felicia Apanius, Marc L. Sallus, Marshal A. Oldman; Parker Mills, David B. Parker; Wershow & Cole, Jonathan Wershow for Plaintiff and Respondent.

_____

The probate court invalidated a trust amendment drafted by one of the beneficiaries—a lawyer who effectively disinherited her sibling. There is no credible evidence that the amendment manifests the intent of the beneficiaries' elderly mother. As the trial court found, the evidence "overwhelmingly establishes that the 2007 Trust Amendment is the product of undue influence." We affirm.

## FACTS

In 1999, Thomas and Elizabeth Plott created the Plott Family Revocable Trust (the Trust).[1] The Plotts had three daughters: appellant Elizabeth Plott Tyler (sometimes referred to as "Tyler" or "Liz"); respondent Sarah Plott Key; and Jennifer Plott Potz, who is not a party to this appeal. The Trust, as amended in 2003, required an equal division of property among the three daughters.

When Mr. Plott died in December 2003, Mrs. Plott became the sole trustee of the Trust. In that role, she was required to divide Trust assets into equal subtrusts: a survivor's trust; a marital trust; and an exemption trust. The Trust directs that the allocation of assets among the subtrusts be made within six months after Mr. Plott's death. That did not occur. The allocation was made in August 2006, nearly three years after Mr. Plott's death.

Trust Attorney Allan Cutrow, a partner at the law firm of Mitchell, Silberberg & Knupp (MSK) recalled "a couple" of meetings with Mrs. Plott before the allocation was made. He had one meeting with her alone in 2004, at which Mrs. Plott expressed a desire to exclude Key from the operation of the family nursing home business while ensuring that "there are enough assets to be distributed to [Key]." Other meetings to discuss asset allocations were attended by appellant or her agents. The estate plan for Mrs. Plott initially proposed by Cutrow left Key over $5 million.

A critical aspect of the asset allocation was that all of the Plotts' skilled nursing homes and convalescent hospitals were allocated to the survivor's trust. Other property

---

[1]     Mrs. Plott was born in 1928.

2

was allocated to the marital and exemption trusts. Trust assets on the date of Mr. Plott's death were worth over $60 million; by January 1, 2006, the value had increased to over $72 million.

The Trust permits Mrs. Plott to alter, amend, modify or revoke the survivor's trust. The marital and exemption trusts are irrevocable. Appellant Tyler, a lawyer who worked in the convalescent hospital business, actively sought to have Mrs. Plott amend the survivor's trust to effectively exclude Key. To this end, appellant enlisted her law partner, Christine Wilson, an associate at appellant's law firm, Cassandra Stajduhar, and MSK Attorney Cutrow. In communications regarding trust administration and in formulating Mrs. Plott's estate plan, appellant's law firm, Tyler & Wilson, was not acting independently of Tyler as an individual.

MSK's January 2004 invoice listed a "conference with client," but Mrs. Plott did not attend the conference. Afterward, Christine Wilson wrote to Cutrow that "Mrs. Plott would like to retain you and your firm to handle the estate and trust administration." Appellant and Wilson instructed Cutrow to send a retainer agreement and all invoices for services rendered to them, not to Mrs. Plott. Cutrow requested a telephone number for Mrs. Plott, but was told to route all inquiries through Tyler & Wilson and not to contact Mrs. Plott directly. Stajduhar conceded at trial that Mrs. Plott was capable of directly conveying her intentions to Cutrow, the estate planning expert.

Terry Steege has been the financial director for the Plott family's businesses since 1992. In September 2004, Steege advised Cutrow "in confidence" that Mrs. Plott felt that appellant and Potz "are trying to take over" and wanted Mrs. Plott to undergo psychological testing "to label her not fit to take care of the trust." Steege noted that appellant "has a big problem with bossing her Mom. Mrs. Plott says (and I am sure you have heard it) that Liz thinks that she is Mrs. Plott's Mother. The truth is the way Liz often times handles herself she does do that. Liz has her agenda and basically makes her Mom fit her agenda and not vice versa. Mrs. Plott complains about this all [the] time but does not confront this with Liz."

3

Steege also advised Cutrow that appellant was over-billing Mrs. Plott for her legal services. He wrote that Mrs. Plott "signs Liz's checks under duress. Mrs. Plott has stated to me numerous times that Liz cannot be responsible for handling her money and spends more than she has constantly, and expects her mother to help her out. So Mrs. Plott has come up with an idea that she wants to cap Liz's legal bills and has suggested this to Liz and Liz went ballistic. [Mrs. Plott] does not trust her and without Liz the corporation would come tumbling down." Steege added that he was going to meet with Mrs. Plott and appellant to discuss capping appellant's legal bills: "Liz has already told me that if her mom pushes it that she will go super-ballistic . . . . The pot between them both has been getting hotter and hotter . . . ."

Cutrow's response to these revelations was to ask Steege about the likelihood that "if Liz got real mad because of the confrontational nature of the meeting . . . she prevails upon Mrs. Plott to fire us." At trial, Cutrow admitted that he never met with Mrs. Plott to discuss whether she signed checks to appellant "under duress." Appellant is strong-willed, and it was "difficult . . . working with Liz and making sure that it was what Mrs. Plott wanted, not Liz." Cutrow added, "Liz would tell me how she wanted [the estate plan] done," clarifying that "she" meant appellant, not Mrs. Plott. Appellant was "anxious to get an amendment done" to the survivor's trust.

Steege testified that his September 2004 message to Cutrow regarding appellant's behavior was composed and sent at Mrs. Plott's request. Steege stated that Mrs. Plott voiced a desire that Key receive no interest in the nursing home business. Yet Mrs. Plott also threatened to disinherit appellant and Potz, on multiple occasions. Mrs. Plott had a problem with appellant "bossing her [ ] around."[2]

---

[2]     At the time of trial, Steege worked for appellant, who controls his bonuses and salary, and could fire him. Appellant pays Steege to administer the Trust, apart from tending to nursing home business matters. On one day in 2009, appellant cut checks to Steege for his work on the Trust, totaling $108,000.

Steege reiterated at trial that Mrs. Plott stated, more than once, that she did not trust appellant. This is because Mrs. Plott wanted to do things her way, but appellant "had her agenda" and would do things differently, which upset Mrs. Plott when she learned of it. Appellant recalled that Mrs. Plott balked at signing checks for appellant's legal bills, provoking appellant to "use[ ] my scary yelling tone." When appellant walked out of the meeting, Mrs. Plott signed the checks. At trial, appellant denied ever raising her voice at Mrs. Plott, which was contradicted by her deposition, when appellant answered, "Yes, I'm sure I did on some occasions."

On May 25, 2007, Mrs. Plott signed an amendment to the provisions of the survivor's trust (the Amendment). Attorney Cutrow either did (per his trial testimony) or did not (per his deposition testimony) review the Amendment with Mrs. Plott paragraph by paragraph before she signed it. He could not recall if others were present when Mrs. Plott signed the Amendment.

Under the Amendment, appellant and Potz were given all of the business assets that produce revenue, with the lion's share—65 percent—going to appellant, who was also gifted the parental home in Beverly Hills and all of its contents. In addition, debts owed to the Trust by appellant (who owed some $2.5 million in principal and unpaid interest) and Potz were forgiven, with the promissory notes being returned to their makers. By securing debt forgiveness, appellant received a benefit of $1,666,666, and Key suffered a loss of $833,333.

Cutrow testified that (1) Mrs. Plott could amend the survivor's trust but (2) appellant's and Potz's promissory notes were not in the survivor's trust, nor was the parental home. Instead, the promissory notes and the family home were in the irrevocable marital trust, which went to all three of the Plotts' daughters equally. The Amendment purports to gift these multi-million dollar items to appellant, even though Cutrow reminded appellant on January 16, 2007, that they are part of the marital trust.

The provisions in the Amendment giving appellant the family home in Beverly Hills, 65 percent ownership of the family nursing home business, and forgiving appellant's $2.5 million debt were generated by appellant's law office, in a redlined

version of the Amendment sent to Cutrow on May 15, 2007, as shown in trial exhibit 61. The same day, Stajduhar billed Mrs. Plott to "incorporate trust revisions per [appellant's] review of Cutrow's draft," as shown in exhibit 75.[3] At trial, appellant denied any involvement in drafting the Amendment.

Initially, Cutrow could not recall at trial how the Plotts' business assets came to be allocated to appellant, not Key. Later, it occurred to him that Mrs. Plott thought appellant should receive the lion's share because appellant was the most active in the family nursing home business.

Mrs. Plott told Key that she wanted Key to inherit equally with her sisters. However, in marked contrast to her sisters, Key received under the Amendment "the lesser of $1,000,000, or 5% of the then Survivor's Trust Estate less any amount owed on any outstanding promissory note in favor of the Surviving Trustor." Appellant and Potz collectively owed millions to the Trust, so the idea was that any gift to Key would be reduced by that amount. When all was said and done, appellant received 65 percent of the business assets, Potz received 35 percent, and Key received $1 million.

Five months before the Amendment was executed, Cutrow met with appellant and Mrs. Plott. In a January 2007 memorandum to the file regarding the meeting, Cutrow wrote that he discussed the proposed modifications to Mrs. Plott and explained "the direction we were moving." At trial, Cutrow could not answer why, if the directions were coming from Mrs. Plott, she had to be told the direction in which "we" were moving. During his deposition, however, Cutrow answered the same question by saying that the directions "at times may have been articulated by Liz." There is no evidence showing that Mrs. Plott herself provided Cutrow with the terms to be included in the Amendment, orally or in writing.

---

[3] The trial court repeatedly cited exhibits 61 and 75 in its statement of decision, as proof that appellant drafted the Amendment to benefit herself unduly. Appellant omitted exhibits 61 and 75 from her appendix. (See *Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 498 [omitted trial evidence is construed against an appellant].)

In his deposition, Cutrow testified that Mrs. Plott, during a December 2006 meeting, told him that she was "***not*** ready to disinherit Sarah." At trial, Cutrow offered an opposing recollection of the meeting: he testified that Mrs. Plott said she is "***now*** ready to disinherit Sarah." (Emphasis added.)[4] After the meeting with Mrs. Plott and appellant, Cutrow sent appellant a draft of the proposed Amendment. Notwithstanding Mrs. Plott's purported desire "to disinherit" Key "now," the draft shows a distribution of $1 million to Key. Mrs. Plott did not receive a copy of the draft Amendment.

After receiving Cutrow's draft, appellant promptly wrote back and stated, first, "[Key's] gift was to be $1 mil not to exceed ___% of the estate prior to gifts to [Potz and appellant]." Second, appellant instructed Cutrow to leave the percentages of the remainder to appellant and Potz blank. Third, appellant instructed Cutrow that before distribution of the remainder, the note she owed to Mrs. Plott was to be given back. Cutrow wrote to appellant that he "did add the language you wanted."

Cutrow did not speak to Mrs. Plott before making the changes that appellant wanted in January 2007, nor did he communicate with Mrs. Plott in March or April 2007. Cutrow "believed" that he met with Mrs. Plott alone, before she signed Amendment in May 2007. But his belief is contradicted by billing entries from appellant's associate Stajduhar, which show that Stajduhar attended Cutrow's presigning meeting with Mrs. Plott on May 24, 2007. Stajduhar sent Cutrow redlined revisions to the Amendment, then attended Mrs. Plott's meeting with Cutrow to execute the Amendment. Stajduhar admitted at trial that she did not speak with Mrs. Plott in May 2007 regarding the redlined revisions: the instructions came from appellant. Stajduhar is not an estate planner; rather, she handled corporate issues related to healthcare facilities at appellant's firm. Appellant likewise denies expertise in estate planning.

---

**4** A memorandum dictated by Cutrow, which summarized the meeting, sheds no light on the confusion.

Appellant admitted at trial that she is unsure whether Mrs. Plott ever saw the Amendment after signing it. The executed instrument was sent to Stajduhar and appellant, not to Mrs. Plott.

In 2004, at the beginning of the trust administration process, Mrs. Plott was not in a wheelchair; she was using a wheelchair by the time she signed the Amendment in May 2007. At trial, appellant testified that Mrs. Plott "loved Sarah" and "there's no question in my mind my mother loved all of her children."

Appellant does not like Key, whom appellant has hardly spoken to since Key was in high school; in an e-mail, appellant referred to Key as "a controlling bitch." Appellant had a pervasive concern that Key would challenge the validity of the Amendment, and wanted a no-contest clause, along with the $1 million gift, to forestall a contest. Though appellant expected a contest, she never asked Mrs. Plott to write down her estate planning wishes in her own hand. Appellant told her parents, Potz, Steege and Cutrow that Key had sued the Plotts. Appellant admitted at trial that this was false: Key never sued their parents or threatened to sue them.

At the time of the Amendment, appellant had financial difficulties. She defaulted in 2003 on the $2.5 million debt she owed to her parents, a loan that was made to her in 1996. At trial, appellant claimed not to know the amount of the debt—whether it was in excess of $1 million or $2 million. She testified that because of the large amount of accrued interest on the debt, she did not have the ability to pay it. Appellant conceded that Mrs. Plott never told her to stop making payments on the debt. Appellant told Cutrow that she was insolvent.

Mrs. Plott had a geriatric evaluation by a psychiatrist, David Trader, hours before she signed the Amendment. Cutrow deemed this evaluation "advisable" given the likelihood of a challenge to the validity of the Amendment due to appellant's role in the Trust administration and the Amendment's effective disinheritance of Key. Cutrow noted that Mrs. Plott had "age-related issues"; was "physically limited"; "had an estate plan that did not divide the assets equally among all three of the children"; and appellant's "relationship with her mother and the role that she played was clearly one that

8

on the surface someone would question." Mrs. Plott relied on appellant for information about the operation of the family business: appellant controlled day-to-day operations. Before the evaluation took place, Cutrow informed Dr. Trader that "one daughter wants [Mrs. Plott] to change estate plans."

A few days before Mrs. Plott's evaluation, Cutrow wrote to Stajduhar to say that appellant would not exercise "undue influence" if she drove Mrs. Plott to the appointment and had lunch with her, adding, "I am more concerned about prepping her for [the mental] test." Dr. Trader issued a mental evaluation finding that despite Mrs. Plott's age-related cognitive deficits, she was not susceptible to undue influence.

Dr. Trader's evaluation was questioned by another geriatric psychiatrist, Dr. Spar. After examining much material, including videotaped depositions of Mrs. Plott, Dr. Spar opined that she was susceptible to undue influence due to mild cognitive impairment (she was unable to name the governor of California or any U.S. presidents prior to the current one) and because she was dependent upon appellant, both as her lawyer and to keep the family business going. People had expressed concerns about Mrs. Plott's memory as far back as 2004. Though Dr. Trader listed the indicia of susceptibility, he failed to apply those indicia to Mrs. Plott. Dr. Spar believed that Dr. Trader "was operating with less than all of the relevant facts." In 2010, Mrs. Plott was diagnosed as having dementia. She died on June 27, 2011.

## PROCEDURAL HISTORY

Key petitioned to invalidate the Amendment. After a lengthy court trial in the summer and fall of 2013, the court crafted a 67-page, single-spaced statement of decision, finding that appellant exerted undue influence. The court granted Key's petition, invalidated the Amendment, and reinstated the terms of the Trust, as amended in 2003, which provides for an equal division of assets among the Plotts' daughters.[5]

---

[5] After trial, the Plott nursing home businesses were sold for $55 million at a probate court auction, alleviating concerns that the parties will have to work together. The issue now is the division of the sale proceeds.

## DISCUSSION

### 1. Appeal and Review

A trust beneficiary may petition the court regarding the validity of trust provisions, including amendments. (Prob. Code, § 17200, subd. (b)(3); *Conservatorship of Irvine* (1995) 40 Cal.App.4th 1334, 1341-1342; *George v. Soares* (1942) 54 Cal.App.2d 29, 31 [challenging the competence of a deceased trustor to execute trust documents].) Appeal is taken from the trial court's order invalidating the 2007 Amendment to the Trust on the grounds of undue influence. The order is appealable. (Prob. Code, § 1304, subd. (a).) On appeal, the trial court's ruling will not be disturbed if supported by substantial evidence. (*George v. Soares*, at pp. 31-32.)

### 2. No Credence Can Be Given to Appellant's or Stajduhar's Testimony

An appellate court does not determine which witnesses should be believed. (*George v. Soares*, *supra*, 54 Cal.App.2d at pp. 31-32.) Instead, "the credibility of witnesses and the weight to be given to the evidence are questions primarily for the trial court and not for this court on appeal." (*Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 778.)

The trial court repeatedly expressed disbelief of appellant's testimony in its statement of decision: "The court has found that Ms. Tyler is NOT credible in material parts of her testimony and does not give weight to Ms. Tyler's testimony." On the next page, the court wrote, "The court finds that Ms. Tyler is <u>NOT CREDIBLE</u> and that the evidence overwhelmingly establishes that Ms. Tyler was involved in all aspects of the drafting and execution of the 2007 Trust Amendment."

Similarly, the trial court wrote that "Judge Stajduhar is NOT credible" because she "<u>never</u> met privately with Mrs. Plott, whom she considered to be her client, to discuss the Trust Amendment," so Stajduhar had no knowledge of Mrs. Plott's intentions and allowed all changes to the Amendment to come from appellant.[6] Stajduhar had no

---

[6] Stajduhar became a workers' compensation judge in 2012.

10

engagement letter with Mrs. Plott and failed to disclose a conflict of interest: Stajduhar was an associate at Tyler & Wilson and took orders from appellant, as appellant's employee. Though Stajduhar characterized the Amendment as "confidential," she kept no confidences from appellant.

Under the circumstances, we give no weight to appellant's testimony or Stajduhar's testimony, as both of them lack credibility.

## 3. Substantial Evidence Supports the Trial Court's Decision

State law has long provided that a donative instrument procured by undue influence is invalid. (*Rice v. Clark* (2002) 28 Cal.4th 89, 96.) "Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amount in effect to coercion destroying the testator's free agency." (*Ibid.*) It may be proven by evidence of "undue pressure, argument, entreaty, or other coercive acts inconsistent with any conclusion that the disposition was the voluntary and freely spontaneous act of the testator or settlor." (*Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035, 1059; *Estate of Fritschi* (1963) 60 Cal.2d 367, 373.) This "subverts independent free will and diverts it from its natural course in accordance with the dictates of another person." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605.)

One indication of undue influence is if "'the chief beneficiaries under the will were active in procuring the instrument to be executed.'" (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 585.) A beneficiary in a confidential relationship with the testator may exert undue influence if he "'displayed activity in the preparation of the will to his undue profit.'" (*Estate of Fritschi*, *supra*, 60 Cal.2d at p. 374.) For example, if a beneficiary attends the execution of a will, and offers the use of her pen, but does not participate in any of the discussions between the testator and the attorney who prepared the will, such "incidental activities" "fail to reach the proportion of a showing of her actual participation in procuring the execution of the will." (*Id.* at pp. 374-375; *Estate of Mann* (1986) 184 Cal.App.3d 593, 608.)

The party contesting a testamentary disposition ordinarily bears the burden of proving undue influence. (Prob. Code, § 8252, subd. (a).) However, "a presumption of

11

undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark*, *supra*, 28 Cal.4th at pp. 96-97.) The trier of fact determines whether the presumption applies, thereby requiring the proponent of the instrument to prove by a preponderance of the evidence that the instrument was *not* procured by undue influence. (*Conservatorship of Davidson, supra,* 113 Cal.App.4th at pp. 1059-1060.)

In this instance, the trial court found sufficient evidence to presume undue influence. This finding then shifted the burden of proof to appellant.

In a will contest, all factual matters are viewed most favorably to the prevailing party. Questions of weight of the evidence and credibility are for the trial court, and its determination must be upheld if there is any substantial evidence, contradicted or uncontradicted, to support it, drawing every reasonable inference in favor of the judgment. (*Estate of Teel* (1944) 25 Cal.2d 520, 526-527.) "'"[T]he appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing*."'" (*Estate of Baker* (1982) 131 Cal.App.3d 471, 476-477.)

There is no shortage of evidence that appellant actually participated in the preparation of the Trust amendment in 2007, personally and by giving directions to others. Drafts prepared by MSK were sent to Tyler & Wilson, not to Mrs. Plott. During the drafting period, Cutrow did not communicate with Mrs. Plott in person, by telephone, by letter or by e-mail. In February 2007, appellant wrote to Cutrow, "After we left your office last time, my mother told me that she was okay with giving me a controlling interest in the business like we discussed, that she did not want to do that with my sister." Cutrow did not meet alone with Mrs. Plott, to confirm that the drafting instructions he received were what Mrs. Plott wanted, as opposed to what appellant wanted. Tyler & Wilson billing records show that appellant's employee Stajduhar attended both the presigning meeting and the meeting at which the Amendment was executed.

12

Unsurprisingly, appellant agrees in her brief that "she had a confidential relationship with her mother . . . and there was substantial evidence that she actively participated in drafting the 2007 Amendment." Appellant thereby concedes the first two elements of the undue influence presumption. Instead, she claims that there is no evidence to support the third element, i.e., that she received an "undue benefit" from the Amendment. When deciding what is "due," the court may consider the relative standing of the beneficiary and the contestant, as well as the testator's past expressions of intent and provisions in previously executed wills. (*Estate of Sarabia*, *supra*, 221 Cal.App.3d at p. 607.) "[T]o know what influence was 'undue' requires knowledge of what influence, if any, would qualify for a more benign interpretation." (*Ibid.*)

Key observes that if the person "alleged to have exerted influence was testator's attorney, any benefit other than compensation for legal services may be considered 'undue.'" (*Rice v. Clark*, *supra*, 28 Cal.4th at p. 97.) Undue influence is presumed when a gift is made to "[t]he person who drafted the instrument." (Prob. Code, § 21380, subd. (a)(1).) No showing of an "undue" benefit is required when the beneficiary has an attorney-client relationship with the testator and participates in preparing the will. (*Estate of Auen* (1994) 30 Cal.App.4th 300, 309-311.) Appellant counters that she is Mrs. Plott's daughter, apart from being an attorney active in the preparation of the donative instrument, so the presumption of undue benefit to an attorney/drafter does not apply here. Appellant is correct. An exception is carved out for "donative transfer[s] to a person who is related by blood." (Prob. Code, § 21382, subd. (a).)

Even without the presumption afforded by Probate Code section 21380 against attorney/drafters, the evidence supports the trial court's finding of an "undue benefit." On the one hand, appellant was active in the family nursing home business. On the other hand, the record also shows that appellant was "bossing her mom," "has her agenda and basically makes her Mom fit her agenda," "went ballistic" when Mrs. Plott tried to cap appellant's legal bills, was not trusted by Mrs. Plott, yet claimed that without appellant's know-how, "the corporation would come tumbling down." Appellant obliged Mrs. Plott

to sign checks "under duress," and used her "scary yelling tone." Appellant exploited her knowledge of the family nursing home business to manipulate Mrs. Plott.

It is reasonable to infer that Mrs. Plott allowed appellant to have her way because appellant threatened to quit and cause the family business to fail. Or appellant made Mrs. Plott's life miserable, causing Mrs. Plott to sign the Amendment "to keep peace," as she told Dr. Trader. This is evidence of an overborne will that makes the transfer to appellant unfair. Appellant's controlling and even threatening demeanor with her elderly parent, coupled with appellant's personal involvement in drafting the Amendment, is evidence that the unequal division of assets contemplated by the Amendment was solely appellant's plan, not Mrs. Plott's.

There is no credible evidence of Mrs. Plott's intentions when she signed the Amendment in 2007. By comparison, Mr. and Mrs. Plott agreed in the 2003 version of the Trust that their assets would go to all three daughters in equal shares. Though Mrs. Plott told Cutrow in 2004 that she did not want Key to participate in the *operation* of the family business, this does not translate into a desire to deprive Key of a financial interest in the business. The trial court could find that the arrangement appellant conjured up— 65 percent of the assets to herself, 35 percent to Potz, and none to Key—was "undue."

The trial court found an undue benefit because appellant drafted the Amendment to forgive the $2.5 million debt she owed, at a time when appellant was insolvent. Mrs. Plott lacked power to forgive appellant's debt, because the promissory note was, in fact, in the irrevocable marital trust, not in the survivor's trust. Similarly, the Amendment purports to give 100 percent of the Plotts' home in Beverly Hills to appellant, along with all of Mrs. Plott's personal effects (art, jewelry, silverware, furnishings, etc.). As with appellant's $2.5 million debt, the parental home was in the irrevocable marital trust and could not be given outright to appellant through the Amendment. Appellant admits that the gift to her of all personal effects also fails: those assets are not in the Trust at all.

It is unclear what appellant had in mind by crafting the Amendment to forgive her own debt and give herself the parental home and personal effects, even after Cutrow

14

reminded appellant by e-mail that these assets are not in the survivor's trust.[7] The trial court could infer that appellant intended to deceive Mrs. Plott, who had allocated the assets to the marital trust and knew, according to Terry Steege, that assets allocated to the marital trust were "set in stone" and would be equally distributed to her three daughters. Or, appellant simply never told Mrs. Plott what the Amendment contained, and neither did anyone else. Mrs. Plott relied upon appellant to explain legal matters. Mrs. Plott offered to show the Amendment to Steege, saying, "They told me not to show you, but I want to show you." Steege refused to look at it.

Appellant asks us to ignore the failed multi-million dollar gifts to her. We decline the invitation. The gifts confer an undue benefit on their face. It is compelling—and relevant—that appellant tried to subvert the Trust allocations, casting doubt on the validity of the entire Amendment. Key was obliged to petition the trial court to invalidate the Amendment and prevent appellant from securing millions of dollars in Trust assets to which she was not entitled. Appellant's reply brief notes her position at trial and in her written response to Key's petition, "that there was no undue influence, and thus no basis for reformation or any other remedy," so Key's petition should "be denied in its entirety." Appellant hoped to claim ownership of all assets gifted to her in the Amendment, even the ones in the marital trust. This evidence supports the trial court's finding that the Amendment is nothing but appellant's desire to benefit herself. It is not a manifestation of Mrs. Plott's intentions, as expressed in the Trust allocations.

Because Key established that appellant received undue benefits from the Amendment that appellant drafted, the burden shifted to appellant to prove that the Amendment was *not* procured by undue influence. The trial court found that appellant failed to carry her burden of disproving undue influence. We agree.

---

[7]     Remarkably, Cutrow implemented appellant's revisions to the Amendment and presented it to his putative client, Mrs. Plott, though he *knew* the Amendment impermissibly affected the irrevocable marital trust.

15

Dr. Trader's mental evaluation of Mrs. Plott did not disprove undue influence. First, his report was issued in June 2007, after Mrs. Plott had already signed the Amendment. Second, the report observes that Mrs. Plott wants to make changes "to keep peace in the family," but she also said that "someone will be unhappy." Dr. Trader never asked why Mrs. Plott felt obliged to either make changes or face familial disruption, considering Mrs. Plott's statement that appellant "now believes she is my mother." Third, the report does not address the terms of the Amendment, which greatly favored one daughter, who sought the changes, over her siblings. Fourth, Dr. Trader listed the elements of undue influence (whether someone has a close emotional/confidential relationship that creates opportunities for control; whether someone "plays an active role in the person's finances"; or whether one party would profit unduly), but then failed to apply these elements to Mrs. Plott's relationship with appellant. The geriatric psychiatrist Dr. Spar testified that Dr. Trader did not have all the relevant facts. For all of these reasons, the trial court gave no weight to Dr. Trader's opinion that Mrs. Plott was not susceptible to undue influence, as it is entitled to do as the trier of witness credibility.

The trial court rejected as "not credible" appellant's claim that she was uninvolved in drafting the Amendment, which, on its face, benefits appellant and disinherits Key with respect to the Plott family's most substantial asset, its nursing homes. The record shows that appellant and her law firm were instrumental in creating and revising the Amendment. Appellant demanded that Cutrow revise the Amendment in ways that benefitted appellant and disadvantaged Key; appellant then failed to produce e-mails to hide her involvement, "in an effort to prevent relevant evidence from being discovered related to determining the validity of the 2007 Trust Amendment," as the court found.

No credible evidence shows that the Amendment arose from Mrs. Plott's instructions to Attorney Cutrow. The trial court's decision correctly reflects that the Amendment "'represents in fact not [Mrs. Plott's] will but that of the person exercising the influence over her.'" (*Estate of Bixler* (1924) 194 Cal. 585, 590.) "If in fact the [Amendment] represents the desire and purpose of [appellant] instead of the desire and purpose of [Mrs. Plott] and was procured [] by dominating and controlling [Mrs. Plott's]

16

mind and will, it is wholly immaterial whether or not [appellant] profited or will profit therefrom." (*Id.* at p. 595; *Estate of Ventura* (1963) 217 Cal.App.2d 50, 59.)

The trial court was not required to reform the Amendment or impose a constructive trust. Reformation is appropriate when there is a mistake, so that the donative instrument lacks agreed-upon terms and does not reflect the testator's actual intent. (*Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1603.) Here, there is no credible evidence of Mrs. Plott's actual intent at the time she signed the instrument.

The reason that appellant identified in her opening brief for reformation or a constructive trust—Mrs. Plott's desire that appellant "carry on her legacy by continuing to run and control the [nursing home] business"—is moot, owing to the posttrial sale of the business. Appellant now indicates that she would like to receive at least 51 percent of the sale proceeds even if she will not be running the business, a number seemingly plucked from thin air. She requests a remand "so that the probate court can consider what disposition Mrs. Plott would have created, had she known that the business would end up sold to a third party." The courts cannot speculate what Mrs. Plott *might* have wanted: the evidence shows that she expected the business to continue, and no one can inquire, postmortem, about her hypothetical views regarding its possible sale.

The Amendment was the product of undue influence, not the outcome of Mrs. Plott's free will, and was properly invalidated in its entirety.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

17