Filed 1/25/24  Estate of Sherman CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| Estate of MARCIA SHERMAN, Deceased. | B323817 |
| FRED BERGER, as Successor Trustee, etc., | (Los Angeles County Super. Ct. No. 19STPB10622) |
| Petitioner and Appellant, | |
| v. | |
| RANDI BERGER, | |
| Objector and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gus T. May, Judge.  Affirmed.

Oldman, Sallus & Gold, Jamie N. Gonzalez, and Kevin W. Yang for Petitioner and Appellant.

Steinhart Law Offices and Terran T. Steinhart for Respondent.

This appeal concerns a brother's petition to disinherit his sister for allegedly violating the no contest clause of their deceased mother's trust. Fred Berger (Fred), as trustee of the Marcia H. Sherman Family Trust (the Trust), filed a petition in probate court asking the court to make certain orders related to the Trust. Randi Berger (Randi), Fred's sister, filed an objection to the petition alleging that one of its primary allegations—that the Trust had been validly established—was false because the Trust agreement was the product of forgery or undue influence. The probate court found Randi's objection was a direct contest but concluded the objection had been filed with probable cause and thus did not violate the no contest clause. Fred appeals, and we consider whether Randi had probable cause to file her objection—focusing on Fred's contentions that she lacked probable cause because (a) the objection was untimely and (b) the facts known to Randi when she filed her objection would not cause a reasonable person to believe the Trust was created through undue influence or forgery.

## I. BACKGROUND

### A. *The Trust*

Marcia Sherman (Marcia) established the Trust on October 19, 2018. The Trust identified Fred, Randi, and Julie Berger as Marcia's three children. It identified the estate held by the Trust as all property held by or transferred to Marcia.

The Trust provides that upon Marcia's death, the trustee is to divide the estate into equal shares for Marcia's three children. The Trust appoints Marcia as the initial trustee, appoints Fred as the successor trustee to serve upon her death, and appoints Randi as the alternate trustee if Fred is unable to serve.

2

The Trust agreement includes a "No Contest" clause that provides in pertinent part as follows: "If any . . . beneficiary under this trust . . . in any manner, directly, or indirectly, and without probable cause (i) contests or attacks this Trust or any of its provisions, or seeks to impair or invalidate any of its provisions . . . then in such event any share or interest in the trust estate given to that contesting person under this Trust is revoked . . . ." The no contest clause defines a "direct contest" as "a pleading that alleges the invalidity of this instrument or one or more of its terms" on certain enumerated grounds including forgery and undue influence. The Trust agreement also defines probable cause, stating it "exists if, at the time of filing of a . . . Direct Contest . . . the facts known to the beneficiary would cause a reasonable person to believe that there is a reasonable likelihood that the relief requested in the action will be granted after an opportunity for further investigation or discovery."

Less than two weeks after the Trust's creation, Marcia died on October 27, 2018. On December 12, 2018, Fred served Randi with a Probate Code section 16061.7 notice stating the Trust had become irrevocable.[1]

### B. *Fred Files a Petition Regarding the Trust*

In November 2019, Fred filed a petition in probate court alleging Marcia had validly established the Trust and Fred became the sole trustee upon her death. Fred also alleged Marcia executed a pour over will concurrently with the Trust agreement that directed her entire estate, other than her personal items, be

---

[1] Statutory references that follow are to the Probate Code.

3

distributed to the Trust. Fred further alleged Marcia was a beneficiary of the estate of her brother, Edward Sherman (Edward), who predeceased her. (At the time of the filing, Edward's will was still in probate.)

Fred's petition asked the court to issue an order determining the Trust was executed on October 19, 2018, was in existence as of the date of Marcia's death, and remained in existence as of the date of the petition. It also asked the court to issue an order determining that Marcia's inheritance from Edward's estate was an asset of the Trust.

### C. *Randi Files an Objection to Fred's Petition*

In July 2020, Randi filed an objection to Fred's petition. Randi's objection asserted the Trust had not been validly established because, even assuming Marcia's signature on the Trust was valid, her establishment of the Trust was the product of Fred's undue influence. Randi submitted six declarations in support of her objections, including her own.

#### 1. *Facts averred in Randi's declaration*

Randi had been Marcia's attorney in fact for financial purposes pursuant to a power of attorney since 1995. Marcia signed a durable power of attorney for health care purposes and a new durable power of attorney for financial purposes naming Randi as the primary attorney in fact in 2018.

Randi had been Marcia's caregiver for 20 years and had helped Marcia operate her legal practice for some time.[2] Randi

---

[2] Marcia needed a caregiver because of various injuries she sustained over the years.

4

previously owned residences in Washington state and Tarzana, California.  She moved into Marcia's Encino home in 2013, following a fire at Randi's California home.  The following year, Marcia began doing Randi's bookkeeping in exchange for the caregiving Randi was performing for Marcia.  They shared checking accounts and credit cards.

Marcia's brother Edward died in December 2017.  Attorney Kira Masteller (Masteller) represented Marcia in matters related to Edward, first in Marcia's capacity as Edward's attorney in fact, and later in her capacity as executor of his estate.  Edward's estate became embroiled in litigation, and Marcia was stressed by dealing with Masteller and believed she was overbilling on the case.

During the fall of 2018, Masteller sent Randi "trust documentation" she prepared for Marcia to sign—without any request to do so from Marcia—and asked Randi to obtain Marcia's signature on the documents.  Marcia did not want Masteller handling any legal proceedings for her and declined to sign the documentation Masteller prepared.  Marcia also explored hiring a different attorney to replace Masteller in handling the probate of Edward's estate, but she found retainer deposits desired by alternative counsel would be too costly.

In June 2018, Fred, who had almost no involvement with the family for decades, approached Marcia and expressed a willingness to help her.  Fred stayed at Marcia's house in early July 2018, and from mid-September to early October of that year, while Randi returned to Washington state.  Shortly after Randi returned to Los Angeles in October, Marcia was admitted to the hospital.  She was released on October 18, 2018, but she needed to have some equipment installed at her home.  Fred offered to

let Marcia stay with him while Randi had the equipment installed.

Between October 18 and October 27, 2018, Randi tried to reach Marcia by calling her cell phone but it was turned off. When she called Fred, he said Marcia was asleep on all but one occasion. Fred allowed Randi to visit Marcia at his home once. During the visit, Marcia seemed extremely fatigued and was slurring her words. A few days later, Fred told Randi he had Marcia admitted to a hospital in Simi Valley. Randi wanted to visit immediately, but Fred did not allow her to schedule a visit until October 28. The day before the visit, Fred informed her Marcia had died.

After Marcia's death, Randi and her sister Julie learned that on the second day Marcia was at Fred's home, Marcia signed a trust document prepared by Masteller naming Fred the trustee of the Trust. Randi found numerous aspects of the Trust documents suspicious, including the Trust's identification of Julie by her maiden name rather than her married name and the absence of any provision in the Trust for Marcia's beloved dogs.

Randi also found numerous actions Fred took in the days before and after Marcia's death suspicious. Fred closed all of Marcia's bank accounts, including the accounts shared with Randi, the day before she died. Fred removed Marcia's answering machine and phone from her bedroom before she died. Fred took possession of Marcia's personal and business documents, including the 2018 powers of attorney. Fred refused to have an autopsy performed on Marcia's body. Fred intentionally or negligently sold Marcia's house for $200,000-300,000 below its market value, without properly marketing it. Fred and Masteller fabricated reports about Randi during the

6

administration of the Trust. And Fred sought to replace Randi as the executor of Edward's estate.

### 2. Other declarations

Five individuals who had known Marcia for many years asserted Randi was very involved in her life. Two of those individuals did not know Fred even existed prior to Marcia's death, and the other two observed he only had minor involvement in Marcia's life. Two of the declarants averred Marcia's dogs meant the world to her, and accordingly, they would have expected her Trust to provide for the care of her dogs.

One of the declarants, Susan McCoy, stated she spoke to Marcia on the phone in August 2018 and she sounded feeble, fatigued, and mentally debilitated. Sarah Belgard said she called Marcia several times during the last week of September 2018, when Randi was in Washington and Fred was staying at Marcia's house, and each time Fred answered the phone and said Marcia was unavailable.

Another declarant, Deanna Sherman (Deanna), was a notary public who performed notary services for Marcia for about six years and considered her a friend. She declared that, in August 2018, Marcia asked Deanna to prepare and notarize a durable power of attorney for health care purposes and a durable power of attorney for financial purposes. Marcia stated she wanted Randi to be her primary power of attorney on both forms, her daughter Julie to be the secondary, and her son Fred to be the tertiary. Deanna told Marcia it would be wiser to name Fred the secondary because Julie would have difficulty exercising her powers while living in London. Marcia responded that she was reluctant to do so because she questioned Fred's trustworthiness,

7

but Marcia nevertheless accepted Deanna's advice and named Fred the secondary power of attorney. Around this time, Marcia told Deanna that her attorney, Masteller, was not competently representing her in matters involving Edward's probate estate and was overcharging her attorney fees.

Deanna further declared that on or around October 13, 2018, Fred contacted Deanna saying Marcia was back in the hospital, had decided to remove Randi as her power of attorney, and wanted to create a trust naming Fred the trustee. Deanna was skeptical, said she needed to speak to Marcia, and offered to immediately visit Marcia in the hospital to speak to her about the requests. Fred seemed ill at ease and nervous; he said he would talk to Marcia and have her contact Deanna—though Marcia never did. Deanna did try to reach Marcia several times through the end of October 2018 by calling both Marcia's cell phone and Fred's phone number, but neither Marcia nor Fred answered or replied to her voicemails. Deanna thought Marcia's silence was strange because she had never experienced difficulty contacting her before. Deanna did not learn of Marcia's death until she contacted Randi in November 2018.

### D. Fred's Initial Response to Randi's Objection and His Subsequent Petition to Disinherit Her

Fred's initial response to Randi's objection contested various factual representations supporting Randi's undue influence claim. Fred also asserted Randi lacked standing to object because she brought her contest to the Trust more than 120 days after she was provided notice, on December 12, 2018, that the Trust had become irrevocable.

8

As evidence in support of his response, Fred submitted declarations by attorneys involved in the creation of Marcia's Trust. A declaration by attorney Kyla Parrino asserted Marcia signed the Trust documents herself and did not appear to lack capacity or to be acting under undue influence when she did so. A declaration by Masteller asserted Marcia called her from the hospital in October 2018 and asked her to prepare her estate plan and to work with Fred to get it done. Masteller also declared that Marcia told her she appointed Fred her power of attorney for asset management and health care, and as executor and trustee of her Trust, because her other local child, Randi, was very difficult to work with. Masteller denied Fred gave her any instructions regarding Marcia's directions for her estate plan. She also stated Fred, Randi, and Marcia were all emailed drafts of Marcia's estate plan.[3]

After filing his response to Randi's objection, Fred also filed a petition seeking an order determining Randi's objection violated the no contest clause of Marcia's Trust. Fred contended Randi lacked probable cause for her objection both because her objection was untimely (he calculated the deadline to file a timely contest as April 12, 2019) and because her forgery and undue influence claims were unsupported and contradicted by facts Fred asserted.

Randi opposed Fred's petition to disinherit her under the Trust's no-contest clause. She argued her objection to Fred's initial petition was not a contest to the Trust because it was a defensive pleading filed in opposition to a petition, not a pleading

---

[3]    A later filing attached a copy of an email that Masteller sent to Fred, Randi, and Marcia with the draft trust documents, but it did not attach the draft trust documents themselves.

alleging the invalidity of the Trust. Randi also argued that if her objection were a contest, she had probable cause to bring it.

### E. The Trial Court's Rulings

The trial court granted Fred's initial petition asking the court to determine the Trust was executed on October 19, 2018, was in existence as of the date of Marcia's death, remained in existence as of the date of the petition, and included among its assets Marcia's inheritance from Edward's estate. Overruling Randi's objection to the petition, the court found the objection was time barred by Probate Code sections 16061.7 and 16061.8.

Fred's separate petition to disinherit Randi for contesting the Trust, however, was still pending, and the parties submitted further briefing and evidentiary objections. The appellate record indicates the probate court held a hearing on the petition to disinherit Randi in May 2022, but Fred has not included a reporter's transcript of that hearing (or a substitute therefor) in the record.

The probate court later issued a minute order memorializing its ruling denying Fred's petition to disinherit Randi. The court found Randi's objection to Fred's initial petition to determine the existence and assets of the Trust qualified as a direct contest because the objection was brought to declare the Trust invalid.

Turning to the question of whether Randi had probable cause to bring her contest given that the 120-day period had long since passed, the probate court concluded the issue of whether Randi's objection was barred by the 120-day rule was "more than debatable," at least in part because Randi filed an objection, rather than a petition that would constitute an "action" to contest

10

the Trust under the relevant statute of limitations. The court concluded Randi's failure to anticipate the issue was not sufficient to justify her disinheritance under the no contest clause.

The probate court additionally concluded the facts presented by Randi in connection with her objection could cause a reasonable person to believe the Trust, created by Marcia nine days before her death, was the product of undue influence. The court reasoned that though all three of Marcia's children received an equal share of the Trust, Fred was entitled to both a fee and control of the estate as trustee, a role he apparently coveted. The court also found the evidence pointed to Fred having a virtually non-existent role in Marcia's life until shortly before she passed, and thus, it was not unreasonable to infer that he feared he might be disinherited or only left a small portion of the estate, with a greater portion going to "his apparent nemesis," Randi, who spent a substantial time with Marcia during her lifetime.

## II. DISCUSSION

Fred's appeal of the probate court's denial of his petition to disinherit Randi is unmeritorious. Even assuming for argument's sake that Randi's objection was a direct contest, the probate court did not err in concluding the objection was not brought without probable cause. As to timeliness, it is unclear from the language of the pertinent Probate Code statute that the 120-day deadline applies to an objection filed in response to another party's petition, and the probate court was justified in concluding a reasonable person could therefore have believed the deadline would not apply. As to the merits of the question of undue influence, the facts at Randi's disposal when she filed the

11

objection are amply sufficient to establish the requisite objectively reasonable likelihood the Trust had been procured by undue influence.

### A.     Standard of Review

To the extent the probate court was required to make underlying factual findings upon conflicting evidence in resolving the petition, we review the record for substantial evidence to support the findings on which the legal rulings were based.  (*In re Estate of Fain* (1999) 75 Cal.App.4th 973, 987-988.)  "In the absence of disputed facts, we review a court's application of a no contest clause *de novo*.  [Citation.]"  (*Meiri v. Shamtoubi* (2022) 81 Cal.App.5th 606, 614.)  We interpret relevant portions of the Probate Code de novo.  (*Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1138.)

### B.     Background Law

"The court's interpretation of a no contest clause and application of the clause to a proposed action is necessarily informed by competing policy interests.  On the one hand, '[s]uch clauses promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument.'  [Citation.]  On the other hand, these interests are '[i]n tension with . . . the policy interests of avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument.'  [Citation.]  'In light of these opposing interests, the common law [and statutory law] in California recognized the enforceability of no contest clauses, albeit strictly construed, "so long as the

12

condition was not prohibited by some law or opposed to public policy.'" [Citations.]" (*Meiri, supra*, 81 Cal.App.5th at 613.)

### C. *Randi's Objection Did Not Violate the No Contest Clause*

By law and under the substantively identical terms of the Trust, a party has probable cause to contest a trust if, at the time the contest was filed, the party knew facts that "would cause a reasonable person to believe that there [was] a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) "The term 'reasonable likelihood' has been interpreted to mean more than merely possible, but less than 'more probable than not.' [Citations.]" (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2022 ed.) foll. § 21311;[4] see also *People v. Proctor* (1992) 4 Cal.4th 499, 523.)

### 1. *Probable cause and timeliness*

"Section 16061.8 sets forth the applicable statute of limitations for petitions that contest a trust." (*Bridgeman v. Allen* (2013) 219 Cal.App.4th 288, 293.) In pertinent part, the statute provides that a person served with a section 16061.7 notification may not "bring an action" to contest the trust more than 120 days from the date the notification by the trustee is served. (§ 16061.8.) The relevant portion of the Probate Code

---

[4] Though not binding, the comments of the California Law Revision Commission are entitled to substantial weight in construing a statute. (*People v. Garfield* (1985) 40 Cal.3d 192, 199.)

13

does not define what it means to "bring an action" to contest a trust.[5]

In the absence of a specific definition, we consider the plain meaning of the phrase "bring an action," a phrase that our Supreme Court recently analyzed in the context of interpreting the Corporations Code. Our high court relied on common definitions of the phrase: "Merriam-Webster defines to 'bring' as 'to cause to exist or occur in any of a number of ways,' including to 'institute' 'legal action' or 'complaint.' [Citations.] Black's Law Dictionary likewise equates the phrase 'bring an action' with '[t]o sue' or to 'institute legal proceedings.' [Citations.]" (*Turner v. Victoria* (2023) 15 Cal.5th 99, 114 [concluding the plaintiff "'sue[d],' 'institute[d] [a] legal proceeding[],' and 'cause[d]' an action 'to exist' by filing a petition in the probate court"].) On this understanding of "bring an action," it would be reasonable to read section 16061.8's limitations period as applying only to pleadings that initiate legal proceedings, not to documents filed in an already existing matter.

Though the probate court in this case found, for purposes of ruling on Fred's initial petition to determine the existence of the Trust, that Randi's objection was brought after the section 16061.8 120-day timeframe, that was not the obvious result

---

[5] While Probate Code section 21310 provides a definition of the term "contest," that definition is limited to the "part" in which section 21310 appears, namely, Part 3 of Division 7 of the Probate Code. Because section 16061.8 appears in Part 4 of Division 9 of the Probate Code, the section 21310 definition does not apply.

14

looking just at the language of the statute that we have just reviewed. A reasonable person could have accordingly believed section 16061.8's limitations period did not apply because Randi did not "bring an action" merely by filing an objection.

Relying primarily on *Meiri*, *supra*, 81 Cal.App.5th 606, Fred argues the untimeliness of Randi's contest necessarily means she lacked probable cause to bring it. That, however, overreads the opinion. In *Meiri*, there was no question as to whether section 16061.8's statute of limitations applied because the beneficiary in that case filed *a petition* to invalidate the trust (among other things). (*Id*. at 611.) That, of course, is not true here, and *Meiri* therefore is not inconsistent with our holding that the date on which Randi filed her objection does not establish she lacked probable cause.

### 2. *Probable cause and undue influence*

"Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96.) "Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence [citation], . . . a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Id*. at 96-97.)

15

Fred contends no reasonable person could believe Marcia was subject to undue influence based on the facts available to Randi when she filed her objection. Fred does not contest that he and Marcia had a confidential relationship, but he argues there was no evidence of active procurement or participation in obtaining the Trust, nor evidence of undue benefit.

Active procurement "may be established by inference . . . ." (*Estate of Baker* (1982) 131 Cal.App.3d 471, 481.) "[T]he one using the undue influence [need not] be present in person at the time of the execution of the document if the influence is present to constrain the party from exercising his free will." (*Ibid*.) "'"That the alleged wrongdoer had power or ability to control the testamentary act may be established by a variety of circumstances[ ]—such as control over the decedent's business affairs, dependency of the decedent upon the beneficiary for care and attention, or domination on the part of the beneficiary and subserviency on the part of the deceased."'" (*Ibid*.) "The question whether the proponent unduly profited by the will is resolved by the terms of the will itself." (*Id*. at 480-481.)

Taken together, the evidence proffered by Randi in her declaration and the declarations from others would cause a reasonable person to believe there was a reasonable likelihood Randi would prevail on the undue influence claim. Marcia was unwell and seemed feeble at the time. Fred had taken her into his home and the evidence supports an inference that he isolated her from her other family and friends. Marcia signed trust documents prepared by an attorney she previously stated she did not want to work with further, and aspects of the Trust seemed inconsistent with Marcia's previously stated practices or desires. Additionally, though Fred did not "unduly" profit from the Trust

16

in the sense that his share of the estate exceeded that of Randi and Julie, a reasonable person could nonetheless consider his receipt of an equal portion an undue benefit given his limited presence in Marcia's life prior to the months leading up to her death.  So, too, could one consider his appointment as trustee, a position that gave him both authority and compensation, as an undue benefit under the circumstances.

Fred's two counterarguments are both unpersuasive.  Fred contends Randi did not submit any evidence regarding Marcia's vulnerability at the time of execution of the Trust, but Randi submitted evidence from which a reasonable person could draw an inference that Marcia was weak and vulnerable in the days surrounding the Trust's creation.  Fred also contends he did not have any authority over Marcia when the Trust was drafted because she was in the hospital, not alone with Fred.  The evidence Randi presented, however, would allow a reasonable person to infer that Fred did have control over Marcia because he limited Marcia's ability to communicate with others when she was under his care, including when she was in the hospital.  Additionally, Marcia signed the Trust after she was discharged from the hospital and was staying at Fred's home.

## DISPOSITION

The probate court's order is affirmed.  Randi is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.